805 A.2d 372

Sriyani MUTHUKUMARANA, Individually, etc,

v.

MONTGOMERY COUNTY, Maryland, et al.

Sarah Fried, et al.,

v.

Kim Archer, et al.

Nos. 83, 84, Sept. Term, 2001.

Court of Appeals of Maryland.

Aug. 26, 2002.

**450**

Daniel A. Brown (Brown & Gould, LLP, on brief), Bethesda, for appellant.

Sharon V. Burrell, Principal Counsel for Self-Insurance Appeals (Charles W. Thompson, Jr., County Attorney, and Joann Robertson, Chief, Division of Litigation, on brief), Rockville, for appellees.

Linda W. Buckel, Asst. County Atty., Cumberland, County Com'rs of Allegany County, Maryland, Linda M. Schuett, County Atty., Annapolis, Anne Arundel County, Maryland, Thurman W. Zollicoffer, Jr., City Solicitor, Baltimore, Mayor and City Council of Baltimore, Edward J. Gilliss, County Atty., William J. Wiseman, III, Asst. County Atty., Towson, Baltimore County, Maryland, Emanuel Demedis, County Atty., Prince Frederick, County Com'rs for Calvert County, Maryland, Kimberly A. Millender, Acting County Atty., Westminster, County Com'rs for Carroll County, Maryland, Barbara M. Cook, County Solicitor, Rebecca A. Laws, Sr. Asst. County Solicitor, Louis P. Ruzzi, Sr. Asst. County Solicitor,

Ellicott City, Howard County, Maryland, Ernest S. Cookerly, County Atty., Chestertown, County Com'rs for Kent County, Maryland, Guy R. Ayres, III, City Solicitor, Ocean City, Mayor and City Council of Ocean City, Sean D. Wallace, County Atty., John A. Bielec, Deputy County Atty., Upper Marlboro, Prince George's County, Maryland, Patrick E. Thompson, County Atty., Stevensville, County Com'rs for Queen Anne's County, Maryland, Richard W. Douglas, County Atty., Hagerstown, County Com'rs for Washington County, Maryland, Edgar A. Baker, Jr., County Atty., Salisbury, Wicomico County, Maryland, Edward H. Hammond, Jr., County Atty., Ocean City, County Com'rs for Worcester County, Maryland, Kurt T. Rumsfeld, Legal Counsel, Intern. Ass'n of Fire Fighters, Washington, DC, Henry W. Underhill, Jr., General Counsel & Executive Director, Intern. Mun. Lawyers Ass'n, Washington, DC, Mark G. Spurrier, Counsel, Maryland Chiefs of Police Ass'n, Inc., Largo, Sue Cusick Greer, Counsel, Maryland Sheriffs Ass'n, Inc., Annapolis, Roger Lee Fink, County Atty., LaPlata, County Com'rs for Charles County, Maryland, brief of amici curiae, for appellees, amicus curiae.

Clifford L. Hardwick (Hardwick & Harris, LLP, on brief), Baltimore, for petitioners.

Philip S. Roberts, Asst. County Atty. (A. Frank Carven, III, County Atty., on brief), Bel Air, for respondents.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

HARRELL, Judge.

These two cases, *Fried v. Archer*, No. 84, September Term, 2001, and *Muthukumarana v. Montgomery County*, No. 83, September Term, 2001, share a common issue: whether local government emergency telephone system employees (specifically operators, dispatchers, and managers) owe an individual tort duty to persons in need of their services, and, if so, under what circumstances the employees may be held liable for the negligent performance of that duty.[1] These cases also present

---

1. Throughout this opinion, we shall utilize the reference "911" to refer to mandated emergency telephone systems and to describe the various

other issues which we shall address, but at the core of both is this shared issue.

Following our examination of the separate factual and pro- cedural backgrounds in both cases, we shall rephrase and consolidate the questions presented for our review. We will consider separately, however, the issues unique to each case. Our general review of the law applicable to 911 employees will then be applied specifically to both cases at hand.

## I.

### A. Fried

On 11 November 1995, Tiffany Fouts, the daughter of Petitioner, Ms. Sarah Fried, arranged to spend the night at

---

employees staffing those systems. Pursuant to Maryland Code (1957, 1997 Repl.Vol.), Article 41, § 18–101, "the three digit number, 911," is "the primary emergency telephone number for the State of Maryland." Every county in Maryland and Baltimore City has a dispatch center "to receive 911 calls and route them to the proper public safety authorities." Amicus Brief, *Muthukumarana v. Montgomery County*, at 3 (filed 14 January 2002).

Additionally, although the cases before us present similar issues, the operation of the emergency telephone systems involved in the cases, along with the individual duties of the 911 employees involved, are not identical. For example, in the Harford County Sheriff's Office ("the HCSO"), the focus of *Fried*, a police communications officer, upon receipt of an emergency call, is responsible for dispatching the call to the police. In Montgomery County, situs of *Muthukumarana*, a public services aide receives emergency 911 calls and is responsible for gathering pertinent information, transferring the call to the appropriate dispatcher, and remaining on the line to gather more information to assist the dispatcher and responding emergency personnel. For purposes of this opinion, however, these differences will not occupy further our attention. Therefore, our references to 911 "systems," "operators," "dispatchers," and "employees" should be understood as encompassing all of the systems and relevant parties involved in these cases.

Finally, our reference to persons "in need of" emergency telephone services is intended to include 1) individuals calling 911 on their own behalf for assistance, and 2) individuals in need of assistance for whom a third party contacts 911. In this opinion, we are concerned not with the relationship between a third party caller who is not personally in need of assistance and a 911 employee, but with the legal relationship, if any, between those persons actually in need of assistance and 911 employees.

the home of her friend, Melanie Meadowcroft. That evening, Tiffany and Melanie visited the home of one of Melanie's acquaintances, Eric F., located at 1443 Charleston Drive, K Court, in Edgewood, Maryland. Three other boys also were present that evening at Eric's home, Donte W., Ricky W., and Louis D., along with Eric's mother, Ms. Tresa F.[2]

Shortly after Tiffany and Melanie arrived, "alcoholic beverages were made available and consumed by all of" the minors at the home. Within one hour, Tiffany began to vomit and "became semiconscious." At that time, "certain guests engaged in non consensual sexual acts with Tiffany," dropped "heavy objects" on her head, and "urinated upon her." In an effort to conceal Tiffany's condition, Eric F. and Donte W. dragged her outside of the home through the basement. They "left Tiffany, wearing only a tee shirt, skirt, socks, and shoes, in an area of woods located directly behind the townhome." *Fried v. Archer,* 139 Md.App. 229, 238, 775 A.2d 430, 435, *cert. granted,* 366 Md. 246, 783 A.2d 221 (2001). The weather at that time "was cold and wet" with a "forecast[ed] winter storm, including snow, approaching the area." *Id.*

Subsequently, Donte W., in the presence of Eric F. and Ricky W., called the Harford County Sheriff's Office ("the HCSO") ostensibly to inform them of the location of Tiffany.[3] Ms. Kim Archer, Respondent, a police communications officer, received the call. The conversation unfolded as follows:

---

**2.** At the time of the relevant events in this case, the two girls, Tiffany and Melanie, and the boys, Eric F., Donte W., Ricky W., and Louis D., were all minors. At least one boy involved in this case was involved in a juvenile proceeding as a result of his behavior on the evening in question, therefore, we limit our description of the boys and the related adult (Eric F.'s mother) to the first initial of their last names.

**3.** After consulting with Ricky W. and Eric F., Donte W. called the HCSO directly, rather than dialing 911, to request assistance. According to Donte W., they were hoping by doing so to hide the fact that Tiffany had been drinking at Eric F.'s home. In our consideration of this appeal, however, it is irrelevant that Donte W. did not dial 911 directly. The purpose and services of the emergency telephone system he reached are the same as those he would have reached had he dialed 911.

[Archer:] Harford County Sheriff's Office, PCO Archer.

[Donte W.:] Hello.

[Archer:] Yes.

[Donte W.:] Um, there's a girl in the back of the woods like.

[Archer:] Back of what woods.

[Donte W.:] Um, Harford Square.

[Archer:] Okay. What's the exact address?

[Donte W.:] There ain't no exact address where she's at.

[Archer:] Okay. What's the residence where she is? Can you give me the residence in front of where she's to the rear of?

[Donte W.:] What's the address to those people over there? Cause she's further that way. 1436? (Inaudible.) 1436.[4]

[Archer:] Okay. Harford Square.

[Donte W.:] Yes, K Court.

[Archer:] Okay. And what's she doing, sir?

[Donte W.:] Just laying there.

[Archer:] Okay. She's just laying to the rear of the house?

[Donte W.:] Yes, she was. She was over a—. She was over here drinking and she was laying there.

[Archer:] Okay. Is she a white female? Black female?

[Donte W.:] Yeah.

[Archer:] Which one?

[Donte W.:] White female.

[Archer:] Okay. White female. Okay. And your last name, sir?

[Donte W.:] I'd just say anonymous.

[Archer:] Okay. We'll send someone out.

---

**4.** Donte W. asked both Ricky W. and Eric F. for the address near Tiffany's location. Eric F., who lived in the home, explained that he provided a different address than where the boys were located (i.e. 1436 K Court, instead of 1443 K Court) to prevent the police from coming to his home and discovering their underaged drinking.

[Donte W.:] Thanks.

Following the call, Archer dispatched Deputy Sheriff Kevin Thomas ("Deputy Thomas") to investigate. In a transmission to Deputy Thomas, which occurred at approximately 10 p.m., Archer erroneously reported that Tiffany was lying to the rear of a residence on J Court, not K Court.[5] The content of the transmission was as follows:

> 10–25 to the rear of 1436 Harford Square Drive—1–4–3–6—Harford Square. It will be J—John—Court. Cross street is Charleston. Anonymous male's requesting a check on well being of a number 2 female. She is lying to the rear of this residence. He believes she's 10–56. Unable to give us any further in reference to description.

Upon Deputy Thomas's arrival at 1436 J Court, " 'it was raining pretty hard' and was '[v]ery cold.' " *Fried*, 139 Md.App. at 242, 775 A.2d at 437 (alteration in original). Deputy Thomas exited his car and walked around the rear of the J Court townhomes, but was unable to locate Tiffany. He returned to his car and called Archer to request a recontact. He asked, "[c]ould the complainant come out to the back and point out where this young lady might be?" Archer replied that there was no reconnect information, stating, "[i]t's an anonymous male. He didn't want to give his information." Deputy Thomas then " 'walked th[e] whole line of houses on that side of the court and then back around to the front.' " *Id.* He "encountered a Maryland State trooper who had also responded to the call, but had searched behind J1 Court, another separate court next to J Court." *Id.* A few minutes later, after finding no one, Deputy Thomas radioed Archer and stated, "10–8, 10–12." According to Deputy Thomas's testimo-

---

5. Fried alleges that Archer was negligent in directing Deputy Thomas to 1436 "J" Court, rather than to 1436 "K" Court, and in failing to report that Tiffany was near a "forested area." We note, however, that Thomas was "familiar" with the "Harford Square townhome development" and knew that there were no "even numbered buildings," such as 1436, on K Court. Given the legal analyses of the shared issue in these cases, this factual distinction is not material.

ny, "Code 12" indicated his determination that the call was an "unfounded complaint."

Although the precise time frame is unclear, Eric F. testified that after making their report to Archer, the boys went "out back" once and checked on Tiffany. Some time later, Eric F. testified that he and Ricky W. attempted to go outside again, but were prevented by his mother, who "came downstairs [and] told [him that he] had to stay in the house." Neither Eric F. or Ricky W. attempted to go outside again that evening. Unfortunately, in the early hours of 12 November 1995, Tiffany died from hypothermia in the location where Eric F. and Donte W. had left her.

Petitioner Fried, Tiffany's mother, filed a wrongful death and survival action in the Circuit Court for Harford County against Respondent Archer, Mr. James Terrell (the chief of Harford County's Emergency Management and Operations Division), Harford County, Maryland, John/Jane Doe ("unidentified dispatch or emergency service employees of Harford County's Emergency Management and Operations Division"), the HCSO, Deputy Thomas, Ms. Tresa F., and the State of Maryland. Fried alleged that Archer "breached her duty of care by failing to make basis inquiries of Donte W." and was negligent "in reporting that Tiffany . . . was behind 'J' Court when in fact she was reported to be and was in fact behind 'K' Court." Fried also maintained that Archer was "further negligent in failing to report that Tiffany . . . was behind townhomes [sic] near a forested area." Regarding Terrell, Fried asserted that he negligently "employed improper procedures and/or failed to properly train [Archer]" which was "a proximate cause of the death of Tiffany."

On 28 December 1998, the "county defendants," [6] including Archer and Terrell, filed a motion to dismiss the claims against them. According to their motion, Archer enjoyed public official immunity, and Archer and Terrell owed no

---

6. The "county defendants" were Archer, Terrell, John/Jane Doe, and Harford County.

"duty to protect [Tiffany] from the criminal acts of the teenage boys in whose company she voluntarily placed herself . . . ." In addition, the HCSO, Deputy Thomas, and the State of Maryland also filed motions to dismiss.[7]

The Circuit Court, on 16 November 1999, filed its memorandum opinion dismissing Archer, Terrell, the State of Maryland, and John/Jane Doe.[8] The court relied on Fried's complaint and her opposition to Respondents' motion to dismiss to conclude that Archer did not "enjoy public official status." It held, however, that the "lack of a legal duty between Archer and the victim [ (Tiffany) ] preclude[d] a favorable judgment for the Plaintiff." According to the Circuit Court, "no special relationship existed between Archer and [Tiffany] and without the existence of a special relationship, Archer had no legal duty to [Tiffany]." Likewise, even though the trial court found that Terrell enjoyed public official immunity, it also found that he owed "no general duty to [Tiffany]" and that "no special relationship ever existed between [Tiffany] and Terrell to bring about a legal duty in this case."

On 22 June 2000, Fried filed an appeal to the Court of Special Appeals from the judgment dismissing Archer and Terrell. Fried argued that " 'Archer and Terrell did owe a legal duty of care to [Tiffany] based on the fact that [Tiffany] was an individual and a member of the class of persons who are the subjects of 911 or emergency calls, . . . and injury to her from failing to give correct location information was readily foreseeable.' " *Fried*, 139 Md.App. at 243, 775 A.2d at 438 (some alterations in original). Additionally, she maintained that the lower court "erroneously applie[d] the concept of a 'special relationship' " to Archer because she is "a mere government employee," rather than a public official. As to Terrell, Fried argued that the "lower court erred in determin-

---

7. At some point prior to the disposition of the motions, Fried "dismissed Ms. [Tresa] F.," *Fried v. Archer*, 139 Md.App. 229, 241, 775 A.2d 430, 437, *cert. granted*, 366 Md. 246, 783 A.2d 221 (2001), Harford County, and the HCSO.

8. Only Ms. Archer and Mr. Terrell are Respondents in this appeal.

ing that [he] ... was a public official" and "erroneously determined that no duty of care existed" between Terrell and Tiffany. According to Fried, "by virtue of the foreseeability of harm resulting from a potential failure to establish proper policies, procedures and safeguards with respect to the training of emergency dispatch operators, a legal duty of care" existed between Terrell and Tiffany.

■ In a reported opinion, the Court of Special Appeals held that the "legal duty owed by police dispatchers to the class of persons who are the subject of 911 or emergency calls, by virtue of their position, is a *public duty* to aid." *Fried,* 139 Md.App. at 257, 775 A.2d at 446. The Court found it appropriate, therefore, to "measure the negligence liability of police dispatchers by the same standard applied to the police officers who respond to their dispatches," and applied the case-by-case application of the special duty rule set forth in *Ashburn v. Anne Arundel County,* 306 Md. 617, 510 A.2d 1078 (1986), in its determination of the liability of Archer and Terrell. *Fried,* 139 Md.App. at 257, 775 A.2d at 446. The special duty rule provides that,

> [i]n order for a special relationship between police officer and victim to be found, it must be shown that the local government affirmatively acted to protect the specific victim or a specific group of individuals like the victim, thereby inducing the victim's specific reliance upon the police protection.

*Fried,* 139 Md.App. at 250–51, 775 A.2d at 442 (quoting *Ashburn,* 306 Md. at 631, 510 A.2d at 1085). As the Court of Special Appeals explained, without such a relationship, " 'liability for failure to protect another citizen does not lie against police officers.' " *Fried,* 139 Md.App. at 250, 775 A.2d at 442 (quoting *Ashburn,* 306 Md. at 628, 510 A.2d at 1083).

In its application of the *Ashburn* test, the Court of Special Appeals interpreted "specific reliance," as mentioned in *Ashburn,* to mean "detrimental and justifiable reliance" and subsequently found that Fried failed to allege the reliance "necessary to establish a special duty." *Fried,* 139 Md.App. at 265,

775 A.2d at 451. According to the intermediate appellate court, the trial court did not err in dismissing Fried's claims against Archer because Tiffany did not rely to her detriment on Archer's promise to send an officer and the boys did not rely justifiably on Archer's promise. *Fried,* 139 Md.App. at 266–67, 273–75, 775 A.2d at 452, 456. Likewise, the Court of Special Appeals affirmed the trial court's dismissal of Fried's claims against Terrell because there were "no allegations indicating Tiffany or her assailants specifically relied on Terrell's allegedly insufficient training and procedures." *Fried,* 139 Md.App. at 276–77, 775 A.2d at 458.

On 12 October 2001, we granted Fried's petition for writ of certiorari to determine the proper analysis to be utilized in evaluating the scope of the duties and tort liabilities of Archer and Terrell.[9]

---

**9.** Fried presented the following questions in her petition:

1. Did the Court of Special Appeals err in concluding, as a case of first impression, that an emergency telephone dispatch operator, Archer, and a director of emergency operations, Terrell, owed no private duty of care to Tiffany Fouts, the deceased minor child of Sarah Fried?

2. Did the Court of Special Appeals err in determining, in a case of first impression, that an unconscious victim is not entitled to a transferred reliance on the promise of emergency assistance to a would-be rescuer?

3. Did the Court of Special Appeals err in holding that the "special duty" rule applies to an emergency dispatch telephone operator such that a "special relationship" would be necessary to impose a duty of care?

4. Did the Court of Special Appeals err in determining that would-be rescuers, intending to orchestrate the rescue of Tiffany Fouts, did not justifiably rely upon the dispatch operator's promise to send help in order to rescue the disabled victim?

5. Did the Court of Special Appeals err in determining[ ] that would-be rescuers intending to orchestrate the rescue of Tiffany Fouts, did not detrimentally rely upon the dispatch operator's promise to send help in order to rescue the disabled victim?

6. Did the Court of Special Appeals err in assuming a role as fact finder in its unilateral conclusions as to whether detrimental reliance and/or justifiable reliance existed on the part of would-be rescuers such that a jury should have determined those issues of fact?

See *infra* Part I.C. for our consolidation of the questions presented in both cases.

### B. Muthukumarana

On 23 August 1998, Ms. Sriyani Muthukumarana, Appellant, and her children, Emil and Budrani, celebrated, along with other family members, Emil's birthday at Wheaton Regional Park in Montgomery County. After returning home from the celebration, Appellant's husband, Mr. Basaru Muthukumarana, who did not attend the birthday party, became agitated with her, reportedly because she had used a tray that belonged to him. While Emil, Budrani, and their cousin, Tharanie, were outside playing, Appellant Muthukumarana and her husband argued inside their home. At some point during the argument, her husband "bashed [Appellant's] head against the wall" which caused her to scream. Upon hearing her scream, all three of the children entered the home.

After the children entered the home, Mr. Muthukumarana ran upstairs. Appellant Muthukumarana dialed 911 from the kitchen,[10] where all three of the children had gathered, and spoke to police services aide Kelley Woodward, Appellee, located at the Montgomery County Emergency Communication Center. Upon receipt of the call, Woodward classified the call as "domestic violence," entered information about the call into her computer, and sent the call onto dispatch. Woodward

---

10. According to Appellant Muthukumarana, she had been "subjected to domestic violence prior to the date of the events at issue in this case." In "response to a particular domestic violence episode in 1994," she applied for "an *ex-parte* protective order which the judge signed." At that time, Appellant received in the mail an "Information/Instruction Sheet For Ex Parte Orders for Protection for Domestic Violence/Child Abuse/Vulnerable Adult Abuse." One section of that information/instruction sheet provided, "[if] you have reason to fear for your safety, you should call '911' for 'EMERGENCY ASSISTANCE'...." Appellant "read that Instruction sheet at the time [she] received it" and asserts that she "relied on [the] directive" to call 911 in this instance. It is somewhat unclear which governmental entity sent her the instruction sheet. The form bears the masthead of the Sheriff of Montgomery County and makes note of a distinction between the Sheriff's Office and the County Police Department ("although we work closely with each other, the ... Sheriff's Office and the ... Police Department are two separate and distinct agencies . ."). Ms. Muthukumarana testified in deposition, however, that she received the instruction sheet from the Montgomery County Police Department.

then remained on the line with Appellant, attempting to obtain information from her, and continuously entered that information into her computer.[11] A transcript of that conversation and background sounds follows:

[Appellant:] (Screaming)

[Woodward:] Montgomery County 911, Hello, Hello.

[Appellant:] (Screaming) Hello?

[Woodward:] What is the nature of the emergency?

[Appellant:] I need help please. My husband is trying to kill me please.

[Woodward:] What is the address?

[Appellant:] 12038 Claridge Drive.

[Woodward:] What is your name?

[Appellant:] Hurry. Sriyani. Budrani—go on.

[Woodward:] Where's your husband at?

[Appellant:] He's home right now. Pleasure [sic] hurry up. Hello.

[Woodward:] Ok mam, What is your name?

[Appellant:] Sriyani.

[Woodward:] Terry?

[Appellant:] My, my head is bleeding, hurry up please.

---

11. The Montgomery County Department of Police Communications Division has a Standard Operating Procedure ("SOP") for a call taker responding to a domestic violence call. The procedure provides that a call taker will "[d]etermine if any injuries require Fire/Rescue response" and then will "[o]btain pertinent information" including the "type and location of any weapons," whether the caller is the victim or a witness, where the assailant is located ("in residence, left scene in vehicle or on foot"), and if there "are drugs or alcohol involved." The call taker then will "[c]omplete call screen, including critical information in 'REMARKS' section and forward it to dispatch." The procedure then instructs that, "[i]f, at this point, it is determined that the caller is in immediate danger," the call taker shall "advise the caller to leave the scene and re-contact the police from a safer location." "If the victim calls from the safer location or remains on the phone," the call taker will "[o]btain additional information" including, the "relationship of the persons involved," the "number of people present at the scene, including children," whether "police have been to [the] residence before for domestic violence," and whether the victim has "a protective order or ex parte order . . . against the abuser."

[Woodward:] Where is your husband at?

[Appellant:] It's bleeding.

[Woodward:] Where is your husband at?

[Appellant:] He's home—he's home.

[Woodward:] Where? I can't understand with you screaming.

[Appellant:] Huh?

[Woodward:] I can't understand with you screaming.

[Appellant:] Please come please.

[Woodward:] Where is your husband at?

[Appellant:] He's home right now.

[Woodward:] What is your husband's name?

[Appellant:] Basaru.

[Woodward:] Matsabu?

[Appellant:] Basaru.

[Woodward:] Are there any weapons there.

[Appellant:] I'm sorry, I can't hear. My kids are screaming.

[Woodward:] Are there any weapons?

[Appellant:] Yeah, he has a gun, he has a big rifle.

[Woodward:] Where, where is the gun at?

[Appellant:] Uh, he, uh, I don't know, he, he has it somewhere, ok?

[Woodward:] Where is it at? Where is the gun at?

[Appellant:] Huh?

[Woodward:] Where is the gun at?

[Appellant:] He, uh, he has—he has it somewhere.

[Woodward:] Does he have it in his possession?

[Appellant:] He has it in his (screaming and shots).[12]

---

**12.** In a tragic turn of events, while Appellant Muthukumarana was on the phone with Woodward, Mr. Muthukumarana entered the kitchen carrying a .45 caliber Colt semi-automatic pistol. Tharanie, Appellant Muthukumarana's niece, ran out of the house to a neighbor's home. Mr. Muthukumarana then shot his two children, Emil and Budrani, a number of times and subsequently shot and killed himself. The conversation between Woodward and Appellant Muthukumarana concluded at

[Woodward:] Hello, Hello.

PHONE DISCONNECTED.

The elapsed time of the conversation between Appellant and Woodward was approximately one minute and forty seconds.

On 27 December 1999, Appellant Muthukumarana filed a wrongful death and survival action for her two children in the Circuit Court for Montgomery County against Woodward and Montgomery County, Maryland. In her complaint, Appellant Muthukumarana alleged that Woodward "negligently and carelessly failed to discharge her responsibilities" to Appellant Muthukumarana in "a reasonable and careful manner by, among other things, failing to timely advise [her] to leave the premises and call back from a safe location such as a neighbor's house or a pay phone." She also maintained that Montgomery County, "through its employees at the E[mergency] C[ommunication] C[enter], ha[d] a duty to discharge its responsibilities to 911 callers in a reasonable and careful manner." According to her, Montgomery County "negligently and carelessly failed to discharge" those responsibilities "by, among other things, failing to timely advise [her] to leave the premises."

On 30 November 2000, Woodward, along with Montgomery County, filed a motion for summary judgment in the Circuit Court arguing that Muthukumarana had "failed to state a claim for negligence" and that Montgomery County was "entitled to governmental immunity from" her claims. A hearing on the motion was held on 8 February 2001. At that hearing, Appellant Muthukumarana "conceded that [Montgomery C]ounty ha[d] governmental immunity," [13] but maintained that it was unnecessary to determine whether a "special relation-

---

that occurrence. When the police arrived on the scene, Emil and Budrani were transported to different hospitals. Both were pronounced dead a short time later.

13. Appellant Muthukumarana abandoned her claim against Montgomery County in the Circuit Court and has not pursued or briefed the issue of Montgomery County's direct liability on appeal. Therefore, we limit our review to the scope of Appellee Woodward's liability.

ship" existed between Woodward and Appellant because the "Good Samaritan doctrine [wa]s triggered immediately by Woodward's undertaking to assist" her.[11] In the alternative, Muthukumarana asserted that a special relationship existed between Woodward and herself because "Montgomery County acted affirmatively by acting to assist and protect persons in imminent danger by implementing the 911 system," and "affirmatively encouraged [her] to call . . . by providing her . . . with an instruction sheet for *ex parte* orders . . . in the context of a previous domestic violence incident." In addition, Appellant maintained that Woodward "affirmatively acted by asking the specific questions that she chose to ask throughout the phone call . . ." and that she "relied on that assistance" and on "those affirmative questions," "reasonably believ[ing] she had to respond to those questions to get help." Finally, Muthukumarana argued that Woodward was "a mere government employee," not "a public official," and, therefore, was "not entitled to any public official immunity."

Woodward, on the other hand, argued that the Good Samaritan doctrine should not apply. In addition, she maintained that the trial court should "look at what [she] did, not what Montgomery County did in enacting the 911 system." According to her argument, she was entitled to summary judgment because "there [wa]s no special relationship, and [she wa]s not liable to [Appellant Muthukumarana]."

---

14. Both Appellant Muthukumarana and Petitioner Fried invoke the Good Samaritan doctrine in their arguments to this Court. That doctrine provides, as expressed in § 323 of the Restatement of Torts, on which both Muthukumarana and Fried rely:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
> (a) his failure to exercise such care increases the risk of such harm, or
> (b) the harm is suffered because of the other's reliance upon the undertaking.

RESTATEMENT (SECOND) OF TORTS § 323 (1965). *See infra* Part IV.B. (discussing the applicability of the Good Samaritan doctrine to the actions of 911 employees in the performance of their duties).

On 9 February 2001, the Circuit Court granted Woodward's motion for summary judgment. In its order and opinion, the Circuit Court held that Woodward was "a public official and therefore entitled to qualified immunity from tort liability." The Circuit Court also concluded that Woodward had not "created a 'special relationship' with" Appellant Muthukumarana because there was "absolutely no affirmative action by Woodward upon which [she] relied that would create a liability—inducing special relationship." While the court agreed "that the circumstances leading to this cause of action [we]re incredibly tragic and soul wrenching, it c[ould] not find that Woodward, in the performance of her duties as a 911 operator, incurred any *legal* liability for th[e] tragedy."

Appellant Muthukumarana then filed an appeal in the Court of Special Appeals. On 12 October 2001, we issued a writ of certiorari on our own motion while the case was pending in the Court of Special Appeals in order to consider the scope of the duties and the possible tort liability of Woodward.[15] On 14 January 2002, we granted the motion of numerous governmental entities and associations to file an amicus brief on behalf of Appellee.[16]

---

15. Appellant Muthukumarana presents the following questions on appeal:
> 1. Whether the Circuit Court erred in ruling, as a matter of law, that PSA Woodward was a public official and thus entitled to qualified immunity.
> 2. Whether the Circuit Court erred in failing to recognize, in any manner, the application of the Good Samaritan doctrine to this case.
> 3. Whether the Circuit Court erred in ruling, as a matter of law, that no special relationship existed arising out of certain affirmative acts taken by PSA Woodward upon which Appellant relied to her detriment, which would waive any qualified immunity of Woodward to the extent any such immunity exists.

See *infra* Part I.C. for our consolidation of the questions presented in both cases.

16. A joint amicus brief was filed by the County Commissioners for Allegany County, Anne Arundel County, Mayor and City Council of Baltimore, Baltimore County, County Commissioners for Calvert County, County Commissioners for Carroll County, County Commissioners for Charles County, Howard County, County Commissioners for Kent County, Mayor and City Council of Ocean City, Prince George's County,

### C.

In an effort to enhance the fluidity, organization, and readability of this opinion, we shall consolidate and rephrase the overlapping questions presented in *Fried* and *Muthukumarana* and separately address the unique issues in each case. The following questions will form the basis of our consideration:

1. Whether the Court of Special Appeals in *Fried* was permitted to determine, as a matter of law, if the boys "relied" on Respondent Archer's promise of assistance for purposes of satisfying the special relationship test.

2. Whether the Circuit Court in *Muthukumarana* denied Appellant Muthukumarana her procedural due process right under Maryland Rule 2–311(f) by ruling that Appellee Woodward was a public official and thus entitled to qualified immunity.

3. Whether 911 operators and dispatchers, as a threshold matter, may assert common law public official immunity.

4. Whether the Good Samaritan doctrine applies to actions taken by 911 operators and dispatchers in handling emergency calls in the course of their employment.

5. Whether the Court of Special Appeals in *Fried* and the Circuit Court for Montgomery County in *Muthukumarana* erred in applying the special relationship test to 911 employees, specifically to operators, dispatchers, and managers, and in subsequently determining that the employees in question had no special relationship with or special duty owed to the individual victims.

## II. Standard(s) of Review

To delineate the standard(s) of our review, we must first address whether the determination that a special relationship

---

County Commissioners for Queen Anne's County, County Commissioners for Washington County, Wicomico County, County Commissioners for Worcester County, International Association of Fire Fighters, International Municipal Lawyers Association, Maryland Chiefs of Police Association, Inc., and Maryland Sheriffs Association, Inc.

exists between two individuals, thereby creating a duty in tort, is a question of fact or law in these cases. Assuming the application of the special relationship test to 911 employees is appropriate, *see infra* Part IV.C. (discussing the applicability of the special relationship test), both Petitioner Fried and Appellant Muthukumarana argue that the lower courts erred in determining whether a special relationship existed between the 911 employees and the victims. Specifically, they maintain that such determinations were questions of fact and should have been left to the trier of fact, rather than decided as a matter of law. Under the circumstances of these cases, we disagree.

In *Liberto v. Holfeldt*, 221 Md. 62, 67, 155 A.2d 698, 701 (1959), we recognized that "when the facts are not disputed and it is certain that reasonable minds could draw but one inference from such facts," the issues of duty and causation "may be resolved as a matter of law." *See also Dersookian v. Helmick*, 256 Md. 627, 631, 261 A.2d 472, 473 (1970) (quoting *Liberto* ). We recently reaffirmed this notion in *Valentine v. On Target, Inc.*, 353 Md. 544, 727 A.2d 947 (1999), and explained that, "[g]enerally, whether there is adequate proof of the required elements needed to succeed in a negligence action is a question of fact to be determined by the fact finder; but, the existence of a legal duty is [a] question of law to be decided by the court." *Valentine*, 353 Md. at 549, 727 A.2d at 949. *See also Bobo v. State*, 346 Md. 706, 716, 697 A.2d 1371, 1376 (1997) ("The existence of a duty is a matter of law to be determined by the court and, therefore, is an appropriate issue to be disposed of on motion for dismissal."). This reasoning is applicable to the cases at hand.

 In both cases before us, there are no disputes as to the material facts.[17] The conversation between Archer and Donte W., as well as the conversation between Woodward and

---

17. We shall explain, *infra* pages 473–74, why both cases are appropriate to review as grants of summary judgment, even though in *Fried* a motion to dismiss for failure to state a cause of action purportedly was the dispositive procedural vehicle used.

Appellant Muthukumarana, were each recorded and transcribed prior to the circuit courts' considerations of the motions. Petitioner Fried and Appellant Muthukumarana do not allege that the transcriptions are other than accurate and complete, nor do they dispute the sequence of events in their cases as reflected in the police and court papers in the records. Consistent with our prior holdings, therefore, the determinations of whether a special relationship existed between the 911 employees and the victims in *Fried* and *Muthukumarana* were considered below appropriately as questions of law.

█ Regarding our review of *Muthukumarana*, we have explained that in reviewing a grant of a motion for summary judgment,

> we are "most often concerned with whether a dispute of material fact exists." *Lippert v. Jung*, 366 Md. 221, 227, 783 A.2d 206, 209 (2001). Where there is no dispute of material fact, however, this Court has stated that the " 'standard of review for a grant of summary judgment is whether the trial court was legally correct.' " [*Id.*] (quoting *Goodwich v. Sinai Hosp. of Balt., Inc.*, 343 Md. 185, 204, 680 A.2d 1067, 1076 (1996)). *See also* [*County Comm'rs of Caroline County v.*] *J. Roland Dashiell & Sons, Inc.*, 358 Md. [83], 94, 747 A.2d [600], 606 [ (2000) ] (" 'In reviewing the propriety of a summary judgment, it is our responsibility to determine whether there was any issue of fact pertinent to the ruling and, if not, whether the substantive law was correctly applied.... Thus, to be upheld, the summary judgment under review must withstand scrutiny on both its factual and legal foundations.' ") (quoting *Bloomgarden v. Coyer*, 479 F.2d 201, 206–07 (D.C.Cir.1973)) (alteration in original). We review the trial court's legal conclusions in rendering summary judgment *de novo*. *Matthews v. Howell*, 359 Md. [152,] 162, 753 A.2d [69,] 74 [ (2000) ].

*Md. Dep't of the Env't v. Underwood*, 368 Md. 160, 171, 792 A.2d 1130, 1136–37 (2002) (some citations omitted). In *Muthukumarana*, there are no genuine disputes as to the materi-

al facts, *see supra* page 472; therefore, our review is limited to whether the Circuit Court was legally correct in granting Appellee Woodward's motion for summary judgment.

■ In *Fried*, Petitioner Fried contests the Circuit Court's grant of Respondents' motion to dismiss. When "reviewing a motion to dismiss for failure to state a claim, trial and appellate courts must assume the truth of all well-pleaded, relevant, and material facts in the complaint and any reasonable inferences that can be drawn therefrom." *Allied Inv. Corp. & Allied Venture P'ship v. Jasen,* 354 Md. 547, 555, 731 A.2d 957, 961 (1999) (citing *Bobo,* 346 Md. at 708, 697 A.2d at 1372). Under Md. Rule 2–322(c), however, if, on a motion to dismiss for failure to state a claim, "matters outside the [complaint] are presented to and not excluded by the [trial] court, the motion shall be treated as one for summary judgment. . . ." *See also Hrehorovich v. Harbor Hosp. Ctr., Inc.,* 93 Md.App. 772, 782, 614 A.2d 1021, 1026 (1992) (quoting Md. Rule 2–322(c)).

■ In the context of Md. Rule 2–322(c), our review of the record in *Fried* reveals that "matters outside the [complaint]" were presented to the Circuit Court which the trial court judge did not exclude. Specifically, Petitioner Fried, subsequent to the hearing on the motion to dismiss, but prior to the issuance and filing of the Circuit Court's opinion and order, filed a supplemental memorandum in support of her position and included, as exhibits, sections of Deputy Thomas's testimony in one of the juvenile proceedings (including portions of his transmissions with Archer) and a transcript of the telephone conversation between Donte W. and Archer. The trial judge did not explicitly exclude any of these additional materials.

Pursuant to Md. Rule 2–322(c), the trial judge's failure to exclude the additional facts operated to transmute the motion to dismiss into consideration of a motion for summary judgment. *See id.* ("If the court does not exclude the outside matters, ... the rule mandates that 'the motion *shall* be treated as one for summary judgment . . . .' ") (citation omit-

ted) (alteration in original). To construe the trial court's action thusly works no surprise or unfairness upon Fried as she, presumably intending that the court consider the information, introduced factual matters beyond the allegations of, and reasonable inferences drawable from, her complaint. Therefore, in *Fried* we will apply the standard of review applicable in reviewing the grant of a motion for summary judgment, set forth at *supra* pages 472–74. As in *Muthukumarana*, there are no genuine disputes as to the material facts in *Fried,* so our review is limited to whether the Circuit Court was legally correct in granting the motion.

### III. Procedural Issues

#### A. Issue 1—Fried

Fried argues that the Court of Special Appeals wrongfully determined whether Donte W., Eric F., and Ricky W. "relied" on Archer's conduct, as applicable in the special relationship test, because "a jury should have determined th[at] issue[ ] of fact." In addition, Fried contends that "instead of . . . looking to the complaint . . . to determine whether a cause of action had been properly alleged," the Court of Special Appeals erroneously "took it upon itself to make rulings on matters of fact" and exceeded its "authority under a motion to dismiss." For the following reasons, both of these arguments shall fail.

As we noted at *supra* pages 471–73, where there is no genuine dispute as to the material facts, it is proper for a court to decide, as a matter of law, whether a special relationship exists. It requires a court to infer as a matter of law, from the uncontroverted material facts, whether the alleged reliance is one that the law is prepared to recognize as sufficient to trigger application of the special relationship test. That determination is not based, as Petitioner Fried alleges, on judicial fact-finding in this case. Therefore, if we assume the application of the special relationship test was appropriate, *see infra* Part IV.C., because there was no dispute as to the material facts in *Fried,* it was proper for the trial and intermediate appellate courts to determine, as a matter of law,

whether a special relationship existed between Respondent Archer and Tiffany. *See Valentine,* 353 Md. at 549, 727 A.2d at 949 ("[T]he existence of a legal duty is question of law to be decided by the court.").

Likewise, we do not accept Petitioner Fried's contention that the Court of Special Appeals improperly exceeded its judicial authority by relying on factual sources beyond the original complaint in explaining its judgment. Pursuant to our discussion at *supra* pages 474–75, the trial court, in opting not to exclude "the matters outside the [complaint]" presented by Petitioner Fried and Archer, treated the motion to dismiss as a motion for summary judgment. Md. Rule 2–322(c). Therefore, on appeal, the Court of Special Appeals was not required to limit itself to the original pleading in its consideration of the case. *See Ashton v. Brown,* 339 Md. 70, 79, 660 A.2d 447, 452 (1995) ("In reviewing the grant of summary judgment, this Court must consider the facts reflected in the pleadings, depositions, answers to interrogatories and affidavits in the light most favorable to the non-moving plaintiffs ....") (quoting *Clea v. Mayor of Balt.,* 312 Md. 662, 677, 541 A.2d 1303, 1310 (1988)). *See also Grimes v. Kennedy Krieger Inst., Inc.,* 366 Md. 29, 73, 782 A.2d 807, 834 (2001) (quoting *Ashton* ).

### B. Issue 2—Muthukumarana

Appellant Muthukumarana maintains the Circuit Court frustrated her "procedural due process right to be heard on the issue of Woodward's public official status" under Md. Rule 2–311(f).[18] Specifically, Muthukumarana contends the Circuit

---

18. Maryland Rule 2–311(f) provides:

A party desiring a hearing on a motion, other than a motion filed pursuant to Rule 2–532 [ (Motion for judgment notwithstanding the verdict) ], 2–533 [ (Motion for new trial) ], or 2–534 [ (Motion to alter or amend a judgment) ], shall so request in the motion or response under the heading "Request for Hearing." Except when a rule expressly provides for a hearing, the court shall determine in each case whether a hearing will be held, but it may not render a decision that is dispositive of a claim or defense without a hearing if one was requested as provided in this section.

Court erred in ruling that Woodward was entitled to public official immunity because Woodward "did not argue" she was entitled to such immunity in her "summary judgment motion or memorandum in support" or "at the summary judgment hearing." Woodward, on the other hand, maintains that Muthukumarana "mistakenly relies on M[d.] Rule 2–311(f) as support for her procedural due process argument" and asserts that she "has pointed to no authority that prohibits a court from disposing of claims on summary judgment on grounds other than those that the moving party proposed."

It is not necessary for us to tarry long on this argument. While maintaining that she was "denied her . . . right to be heard" on the issue of Woodward's public official status, Muthukumarana concurrently acknowledges that she raised in her opposition to the motion for summary judgment that Woodward was not entitled to public official immunity, even though Woodward had not asserted it. As Muthukumarana explained, "[i]n both her brief and at oral argument, [she] plainly asserted that Woodward was not a public official." [19] We fail to see how these circumstances amount to a denial of a "procedural due process right to be heard." Despite Woodward's failure to mention the doctrine of public official immunity in her motion for summary judgment, Muthukumarana obviously anticipated and argued the issue. Appellant Muthukumarana injected the issue of public official immunity before the Circuit Court.[20]

---

**19.** In her opposition to the motion for summary judgment, Appellant Muthukumarana stated that Appellees (Ms. Woodward and Montgomery County) "have not asserted (nor can they) that Kelley Woodward is entitled to any individual immunity from [Appellant's] claim of negligence." Muthukumarana also maintained that Appellees could not "satisfy" the "first prong of the immunity test because Kelley Woodward is not a public official." In oral argument at the hearing on the motion for summary judgment, Muthukumarana likewise argued "Kelley Woodward is not a public official; she is not entitled to any public official immunity. . . . Kelley Woodward, in our case, is just like any other civilian. She is a mere government employee. She is not entitled to public official immunity."

**20.** Even had we concluded the Circuit Court acted erroneously in reaching the question of public official immunity, any error that may

## IV.

We now shall generally address the overlapping questions presented in *Fried* and *Muthukumarana* regarding whether 911 employees, specifically operators, dispatchers, and managers, owe a special duty in tort to persons in need of their services, and whether those employees may be held liable for the negligent performance of their duties. Our review of the remaining three issues will address as a whole, rather than individually, the arguments and issues relevant to both cases, as set forth below. Individual application of our conclusions to each case at hand will follow that review.

### A. Public Official Immunity

Petitioner Fried and Appellant Muthukumarana maintain that 911 operators and dispatchers are not entitled to public official immunity. According to Muthukumarana, the Circuit Court erred. in concluding that Woodward was entitled to public official immunity because Woodward does not "satisfy the prerequisite of being a public official" and was "not performing a 'discretionary act' as required ... to claim public official immunity." In like manner, Fried asserts that Archer was "not a governmental official, but merely an employee, and was not performing a discretionary but, rather, merely a ministerial act."

Woodward contends that because the Circuit Court "found that [she] did not have a special relationship with [Appellant] Muthukumarana," the determination as to whether the Circuit Court "erred in holding that [she] was a public official entitled to qualified immunity [wa]s not dispositive to [her] appeal." Archer counters Fried's argument and maintains that "the

have occurred in the dispatch of the immunity issue would constitute, at the greatest, mere harmless error in light of our disposition on the merits of that issue, *see infra* Part IV.A. And, " 'it has long been settled policy of this [C]ourt not to reverse for harmless error.' " *Beahm v. Shortall*, 279 Md. 321, 330, 368 A.2d 1005, 1011 (1977) (quoting *Johnson & Higgins v. Simpson*, 163 Md. 574, 588, 163 A. 832, 837 (1933)). *See also Benik v. Hatcher*, 358 Md. 507, 537, 750 A.2d 10, 26 (2000) ("It is well settled that a civil judgment will not be reversed unless the complaining party shows both error and prejudice.").

police dispatcher qualifies as a public official" and that "[a]s [she] was exercising discretion within the scope of her employment, she enjoyed public official immunity as a matter of law."

For the following reasons, we agree with Petitioner Fried and Appellant Muthukumarana and conclude that 911 operators and dispatchers, on these facts, are not entitled to public official immunity. At common law, a government actor will enjoy a qualified immunity from liability for his or her "non-malicious acts where: (1) he 'is a public official rather than a mere government employee or agent; and (2) his tortious conduct occurred while he was performing discretionary, as opposed to ministerial, acts in furtherance of his official duties.' " *Ashburn,* 306 Md. at 622, 510 A.2d at 1081 (quoting *James v. Prince George's County,* 288 Md. 315, 323, 418 A.2d 1173, 1178 (1980)) (emphasis omitted). *See also Lovelace v. Anderson,* 366 Md. 690, 704, 785 A.2d 726, 734 (2001) (quoting *James* ). " 'Once it is established that the individual is a public official *and* the tort was committed while performing a duty which involves the exercise of discretion, a qualified immunity attaches; namely, in the absence of malice, the individual involved is free from liability.' " *Lovelace,* 366 Md. at 705, 785 A.2d at 734 (quoting *James* ).

In *James,* we enumerated guidelines to be used in determining whether an individual is a public official, including whether:

(i) The position was created by law and involves continuing and not occasional duties.

(ii) The holder performs an important public duty.

(iii) The position calls for the exercise of some portion of the sovereign power of the State.

(iv) The position has a definite term for which a commission is issued and a bond and an oath are required.

*James,* 288 Md. at 324, 418 A.2d at 1178 (citing *Duncan v. Koustenis,* 260 Md. 98, 105, 271 A.2d 547, 550 (1970)). Additionally, there are at least two exceptions to the guidelines, "where an individual fails to meet most of the above tests, and

yet is nevertheless considered to be a public official," which include "those individuals who exercise 'a large portion of the sovereign power of government,' " and "those individuals who can be called on to exercise police powers as conservators of the peace." *Duncan*, 260 Md. at 106, 271 A.2d at 551 (citation omitted) (emphasis omitted). *See also James*, 288 Md. at 324–25, 418 A.2d at 1178–79 (quoting *Duncan* ).

Pursuant to our standards for determining whether an individual is a public official entitled to immunity, it is apparent that 911 operators and dispatchers do not qualify for that protection. Although we agree that 911 operators and dispatchers perform an important public duty, they fail to satisfy most of the requirements for classification as a "public official." Specifically, their positions are not "created by law," do not "call for the exercise of . . . the sovereign power of the State," do not "have a definite term for which a commission is issued," and do not "require" a "bond and an oath." *James*, 288 Md. at 324, 418 A.2d at 1178.

In addition, 911 operators and dispatchers do not fall within either of the two exceptions to the guidelines, where an individual is "nevertheless considered to be a public official." *Duncan*, 260 Md. at 106, 271 A.2d at 551. The first exception, which requires that an individual "exercise 'a large portion of the sovereign power of government,' " contemplates someone serving "in a legislative or policymaking capacity." *Id.* (citation omitted). In *Duncan*, we held that a public school teacher did not meet the terms of that exception because he "d[id] not make rules and regulations or determine county educational policy." *Id.* Under the same rationale, 911 operators and dispatchers cannot invoke that exception because, by the nature of their duties, they execute, rather than determine and adopt, governmental policy.

The second exception, applicable to those who "can be called on to exercise police powers as conservators of the peace," also does not extend to 911 operators and dispatchers. *Id.* Again in *Duncan*, we compared a public school teacher, who did not

meet the second exception, to a sheriff, who did meet the exception, and noted a

> subtle distinction between authority in the nature of police power and the authority used by a teacher. The former is exercised in opposition to those subject to it for the public good whereas the latter is exercised as a service to benefit those immediately subject to it while also directed to the ultimate public welfare.

*Duncan,* 260 Md. at 107, 271 A.2d at 551. Any "authority a teacher might be considered to exercise in his own right," we explained, "would not be in the nature of police power." *Duncan,* 260 Md. at 106, 271 A.2d at 551. Similarly, the acts of a 911 operator or dispatcher providing a service to benefit an individual caller and the public welfare also do not satisfy the exception. The handling of an emergency call is not an exercise of power "in opposition to those subject to it for the public good." *Duncan,* 260 Md. at 107, 271 A.2d at 551. Rather, it is an exercise of power for the benefit of those in need of 911 services.

Because we find 911 operators and dispatchers are not "public officials," as contemplated in *Duncan* and *James,* it is not necessary for us to examine the particular acts in question to determine whether they were discretionary and performed within the scope of official duties. The initial failure of 911 operators and dispatchers to qualify as public officials prevents them from enjoying a public official immunity at common law.[21]

## B. Good Samaritan Doctrine

Petitioner Fried and Appellant Muthukumarana contend that the Good Samaritan doctrine, which subjects an individual to liability for his or her failure to exercise reasonable care in rendering protective services to another, is applicable to the actions of 911 operators and dispatchers taken in the course of

---

21. Because we delimit the scope of Respondent Terrell's liability in *infra* Parts IV.C. and V.A., it is not necessary for us to determine here whether he is entitled to common law public official immunity.

performing their employment duties. According to Fried, Respondent Archer "was paid to perform her functions as an emergency dispatch operator," "failed to exercise reasonable care in performing" her duties, and, as a result of her failure to exercise reasonable care, should be liable for the "increased the risk of harm" she caused to Tiffany "by beginning to assist her, but failing to follow through. . . ." Similarly, Muthukumarana alleges that Appellee Woodward "undertook, for consideration . . . , to render services to" Appellant and should be "subject to liability for her failure to exercise reasonable care where" her "failure to follow the S[tandard] O[perating] P[rocedure]" increased the risk of harm to Appellant, and where she "suffered harm by relying on 911 and Woodward's questioning."

In response, Archer argues that a different tort principle, specifically the special relationship test, is controlling in her case. Woodward also argues that "the Good Samaritan doctrine is not the appropriate standard to apply to determine the liability of 911 operators" and cites the "chilling effect" it would have "on a government's ability to hire and retain 911 operators." Additionally, Woodward maintains that she "did not undertake to assist Appellant [Muthukumarana]," as required by the Good Samaritan doctrine, by taking "basic information from" her.

The Good Samaritan doctrine, as argued by Fried and Muthukumarana from the Restatement (Second) of Torts, provides:

§ 323 Negligent Performance of Undertaking to Render Services.

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking.[22]

RESTATEMENT (SECOND) OF TORTS § 323 (1965). Even assuming, for purposes of this analysis, that Maryland recognizes a common law Good Samaritan doctrine as framed in the Restatement, it would not apply here.

Pursuant to § 323, an individual who undertakes, "gratuitously or for consideration," to render protective services to another may be subject to liability for his or her failure to exercise reasonable care in doing so. Petitioner Fried and Appellant Muthukumarana would have us interpret the clause "for consideration" as including the salary paid to 911 operators and dispatchers by their employers, thereby imposing liability on those 911 employees for actions taken in the course of performing their employment duties. Drawing on our prior interpretation of the meaning of an analogous term in the context of Maryland's Good Samaritan immunity statutes,[23] we decline to do so.

---

**22.** Fried did not include subsection (b) from the Restatement in her argument.

**23.** Maryland's Good Samaritan immunity statutes provide immunity to certain individuals and entities for liability arising under the general principles of the Good Samaritan doctrine. *See, e.g.,* Md.Code (1974, 1998 Repl.Vol.), Courts and Judicial Proceedings Art., § 5-603 ("Emergency medical care"); § 5-604 ("Fire and rescue companies"); § 5-605 ("Law enforcement officer acting outside jurisdiction"); § 5-607 ("Volunteer sports program physicians"); § 5-614 ("Emergency veterinary assistance").

Petitioner Fried and Appellant Muthukumarana seize on the existence of these statutes and argue that the Good Samaritan doctrine should apply to 911 operators and dispatchers because the Legislature "chose not to immunize 911 call takers in this regard." We note, however, that neither Fried or Muthukumarana provide legislative history for any enacted Good Samaritan statute or for any attempt to extend such a statute to 911 personnel in support of this position. Even if there were evidence of such failed proposals, "the fact that a bill on a specific subject fails of passage in the General Assembly is a rather weak reed upon which to lean in ascertaining legislative intent," *Auto. Trade Assoc. of Md., Inc. v. Ins. Comm'r of the State,* 292 Md. 15, 24, 437 A.2d 199, 204 (1981), and "legislative intent cannot be inferred solely from failure of a bill ...." *NCR v. Comptroller of the Treasury, Income Tax Div.,* 313 Md. 118, 126, 544 A.2d 764, 767 (1988).

Under Maryland Code (1974, 1998 Repl.Vol.), Courts and Judicial Proceedings Article, § 5–603, certain emergency medical care providers are "not civilly liable for any act or omission in giving any assistance or medical care, if," in part, "[t]he assistance or medical care is provided *without fee or compensation* . . . ." (Emphasis added.). In *Tatum v. Gigliotti*, 321 Md. 623, 583 A.2d 1062 (1991), we interpreted the language of an earlier version of the Good Samaritan Act, specifically Md.Code (1981), Art. 43, § 132(a) (recodified as Md.Code (1974, 1998 Repl.Vol.), Courts and Judicial Proceedings Art., § 5–603), which provided immunity to certain individuals rendering "medical aid, care, or assistance for which he charges no fee or compensation."[24] In so doing, we affirmed the judgment of the Court of Special Appeals, *Tatum v. Gigliotti*, 80 Md.App. 559, 565 A.2d 354 (1989), *aff'd*, 321 Md. 623, 583 A.2d 1062 (1991), and held that a *salaried* emergency medical technician operating within the scope of his duties was entitled to the immunity provided in the statute. As the Court of Special Appeals explained, "salaried personnel do not receive 'compensation' within the meaning of this section." *Tatum*, 80 Md.App. at 568, 565 A.2d at 358.

 Although "consideration," as used in § 323 of the Restatement, and "compensation," as used in § 5–603, are not identical terms, they are recognized generally as synonyms of each other.[25] Accordingly, it is appropriate for us to extend our holding that a salary does not constitute a "fee or compensation" under § 5–603 to an interpretation of "for consideration" under § 323 of the Restatement. Specifically, under § 323, the imposition of liability on an individual for his or her

---

**24.** The slight difference in statutory language between Md.Code (1974, 1998 Repl.Vol.), Courts and Judicial Proceedings Art, § 5–603, as codified today, and its former codification as Md.Code (1981), Art. 43, § 132(a), has not altered our interpretation of "compensation" in *Tatum v. Gigliotti*, 321 Md. 623, 629, 583 A.2d 1062, 1065 (1991).

**25.** "Consideration" is defined as "[r]ecompense" and "payment." WEBSTER's NINTH NEW COLLEGIATE DICTIONARY (9th ed.1989). "Compensation," similarly, means "something that constitutes ... recompense" or a "payment." *Id.*

negligent undertaking to render services to another does not include the non-voluntary actions taken by a 911 operator or dispatcher in the course of his or her employment. A 911 operator or dispatcher generally receives a salary from his or her employer, not from the person in need of assistance. That payment would not qualify as "consideration" within the meaning of § 323. Therefore, the common law Good Samaritan doctrine, at least as argued in this case, would not be applicable to the actions of 911 operators and dispatchers taken in the course of performing their employment duties.

## C. Special Relationship

Finally, Petitioner Fried and Appellant Muthukumarana argue that the Court of Special Appeals and the Circuit Court for Montgomery County, respectively, erred in applying the special relationship test to 911 employees or, in the alternative, erred in determining that the employees in question had no special relationship with or duty owed to the individual victims. Specifically, Fried maintains that the Court of Special Appeals "erroneously determined that a tort duty owed from an emergency dispatch telephone operator to a victim is governed by the 'special relationship' rule." According to Fried, a "special relationship is applicable only to a public official under the public duty doctrine ...," and Respondents Archer and Terrell are mere employees. Likewise, Muthukumarana contends that the Good Samaritan doctrine, not the special relationship test, should be applied to 911 operators and that "the Good Samaritan doctrine imposed a duty on Woodward (separate from any duty that may lie under a special relationship) to act in a reasonable manner toward Plaintiff."

For their parts, Woodward, Archer, and Terrell acknowledge that 911 employees generally owe a duty to the public at large. According to Appellee and Respondents, however, only if such an employee makes "assurances that induce specific reliance by the citizen, [does he or she] create[ ] a special relationship with the citizen extending the general public duty owed to a specific private duty in tort."

For the following reasons, we agree with Appellee and Respondents that, absent a special relationship between a 911 employee and an individual in need of emergency services, an employee does not owe such an individual a private duty in tort. To maintain an action in negligence, a plaintiff must assert the following elements: " '(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty.' *Valentine*, 353 Md. at 549, 727 A.2d at 949 (quoting *BG & E v. Lane*, 338 Md. 34, 43, 656 A.2d 307, 311 (1995) (citing *Rosenblatt v. Exxon*, 335 Md. 58, 76, 642 A.2d 180, 188 (1994))). "Duty" in negligence "has been defined as 'an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another.' " *Ashburn*, 306 Md. at 627, 510 A.2d at 1083 (citation omitted). The existence of "a legally recognized duty owed by th[e] defendant to th[e] plaintiff or to a class of persons of which th[e] plaintiff is a member is vital to sustaining a cause of action in negligence." *Valentine*, 353 Md. at 549, 727 A.2d at 949. *See also Ashburn*, 306 Md. at 627, 510 A.2d at 1083 ("[N]egligence is a breach of a duty owed to one, and absent that duty, there can be no negligence."). Our consideration, therefore, begins with a determination of whether 911 employees owe a legally recognized tort duty to individuals in need of their assistance.

In previous cases, we have defined the scope of the tort duty owed by police officers to persons in need of assistance by applying the "public duty doctrine." Generally, under the public duty doctrine, when a statute or common law "imposes upon a public entity a duty to the public at large, and not a duty to a particular class of individuals, the duty is not one enforceable in tort." Dan B. Dobbs, The Law Of Torts § 271 (2000) (footnote omitted). As we explained in *Ashburn*, the "duty owed by the police by virtue of their positions as officers is a duty to protect the public." *Ashburn*, 306 Md. at 628, 510 A.2d at 1084. Pursuant to the doctrine, therefore, police officers ordinarily may not be held liable for failure to

protect specific persons because they owe no duty, as the first element of a negligence action requires, to those individuals.[26]

The public duty doctrine, however, is not without its limitations. Specifically, it "has no application when the court concludes that a statute or court order has created a *special duty* or specific obligation to a particular class of persons rather than to the public at large." DOBBS, *supra,* § 271 (emphasis added). As we have explained, this is "nothing more than a modified application of the principle that although generally there is no duty in negligence terms to act for the benefit of any particular person, when one does indeed act for the benefit of another, he must act in a reasonable manner." *Ashburn,* 306 Md. at 631, 510 A.2d at 1085 (citing *Scott v. Watson,* 278 Md. 160, 170–71, 359 A.2d 548, 555 (1976); *Pennsylvania R.R. Co. v. Yingling,* 148 Md. 169, 129 A. 36 (1925)). Therefore, "[a] proper plaintiff ... is not without recourse. If he alleges sufficient facts to show that the

---

26. The application of the public duty doctrine to police officers recognizes that

> [police] officials who act and react in the milieu of criminal activity where every decision to deploy law enforcement personnel is fraught with uncertainty must have broad discretion to proceed without fear of civil liability in the "unflinching discharge of their duties." ... [I]f the police were held to a duty enforceable by each individual member of the public, then every complaint—whether real, imagined, or frivolous would raise the spectre of civil liability for failure to respond. Rather than exercise reasoned discretion and evaluate each particular allegation on its own merits the police may well be pressured to make hasty arrests solely to eliminate the threat of personal prosecution by the putative victim.

*Ashburn v. Anne Arundel County,* 306 Md. 617, 629, 510 A.2d 1078, 1084 (1986) (quoting *Morgan v. District of Columbia,* 468 A.2d 1306, 1311 (D.C.1983) (citations omitted)) (alteration in original).

Furthermore, it acknowledges that "a policy which places a duty on a police officer to insure the safety of each member of the community would create an unnecessary burden on the judicial system." *Ashburn,* 306 Md. at 630, 510 A.2d at 1084. As the District of Columbia Court of Appeals explained, the application of the public duty doctrine to police officers recognizes that "juries and courts are ill-equipped to judge 'considered legislative-executive decisions' as to how particular community resources should be or should have been allocated to protect individual members of the public." *Morgan,* 468 A.2d at 1311 (citations omitted).

defendant policeman created a 'special relationship' with him upon which he relied, he may maintain his action in negligence." *Ashburn,* 306 Md. at 630–31, 510 A.2d at 1085 (footnote and citation omitted). In order for a special relationship between police officer and an individual to be found, however, we required in *Ashburn* that it "be shown that the local government or the police officer affirmatively acted to protect the specific victim or specific group of individuals like the victim, thereby inducing the victim's specific reliance upon the police protection." [27] *Ashburn,* 306 Md. at 631, 510 A.2d at 1085 (citations omitted).

Although our opinion in *Ashburn* involves the application of the public duty doctrine to police officers, it does not limit the application of that principle to police officers alone or otherwise prevent our consideration of it in the context of 911 employees. A review of the duties of 911 personnel reveals that 911 personnel play a significant role in coordinating, facilitating, and effectuating adequate emergency service responses. As the amicus brief explained,[28]

---

27. The Supreme Court of Washington applies slightly different factors in determining whether a special relationship exists, but has provided a useful description of the special relationship test in general. In *Babcock v. Mason County Fire Dist. No. 6,* 144 Wash.2d 774, 30 P.3d 1261 (2001), it explained that " '[t]he special relationship exception [to the public duty doctrine] is a 'focusing tool' used to determine whether a local government [entity] 'is under a general duty to a nebulous public or whether that duty has focused on the claimant.' " *Babcock,* 30 P.3d at 1268 (quoting *Taylor v. Stevens County,* 111 Wash.2d 159, 759 P.2d 447, 451 (1988) (citation omitted)).

28. The information presented in the amicus brief and quoted here is gleanable otherwise from undisputed sources within the record, including Appellee Woodward's deposition testimony delineating the duties of a public services aide in Montgomery County and describing the County's Emergency Communication Center system, the Montgomery County SOP for a call taker responding to a domestic violence call, and Deputy Thomas's testimony, in one of the juvenile proceedings, regarding his communications with Respondent Archer as a result of Donte W.'s call. We borrow here from the amicus brief because it provides a concise and coherent explanation of the general duties of 911 employees and the nature of 911 services as a whole.

[t]he job of 911 personnel is not to provide the emergency services that the caller needs, for himself or for someone else, but to facilitate the response of appropriate resources.

Although 911 personnel are sometimes lumped together and referred to as 911 operators, as an operational matter, personnel in 911 centers and other emergency communications personnel perform specific tasks: some act as call takers, who speak directly to the callers; others, as fire and rescue dispatchers or police dispatchers, who relay the message to appropriate public safety personnel; and still others, as supervisors, who supervise center operations, train 911 personnel, and even perform call-taking or dispatch functions as staffing and call volume require.

. . .

[T]he emergency communications call taker's primary job is to find out from the caller enough about the emergency to classify the call for appropriate public safety response, and to verify the name and address of the caller. . . .

. . .

But call takers are often asked to do more than classify calls and send help. Protocols applicable to emergency call takers in some jurisdictions encourage the operator to stay on the line, after emergency personnel have already been dispatched, to try to get additional information that may affect the level of response or that may assist the responder to understand and deal with the situation when they arrive. Other internal protocols are designed to determine whether there is anything the caller may need to do before police, fire or emergency medical personnel arrive.

Amicus Brief, *Muthukumarana v. Montgomery County*, at 8–11 (filed 14 January 2002). Based on the nature of his or her duties, we agree that "[a] police dispatcher's work is necessarily an integral link in the chain of emergency services ultimately delivered by the responding police officers." *Fried*, 139 Md.App. at 257, 775 A.2d at 446. Therefore, while we do not suggest that 911 operators and dispatchers have duties or responsibilities commensurate with those of police officers, we

agree with the Court of Special Appeals that "it is appropriate to measure" their negligence liability, as well as the liability of their managers and supervisors, "by the same standard applied to the police officers who respond to their dispatches." *Id.* Pursuant to that holding, the legal duty owed by 911 employees "by virtue of their position, is [also] a *public* duty to aid." [29] *Id.*

As with police officers, significant policy concerns motivate our application of the public duty doctrine to 911 personnel. As the Court of Special Appeals explained in *Fried*, " '[f]or the courts to proclaim a new and general duty of protection in the law of tort, even to those who may be the particular seekers of protection based on specific hazards, could and would inevitably determine how the limited police resources of the community should be allocated and without predictable limits.' " *Fried*, 139 Md.App. at 258, 775 A.2d at 447 (quoting *Riss v. City of New York*, 22 N.Y.2d 579, 293 N.Y.S.2d 897, 240 N.E.2d 860, 861 (1968)). By applying the public duty doctrine to 911 personnel, we are able to prevent "that new and general duty of protection" from resulting "in the reduction of public safety services, including emergency response programs and personnel, to the community." *Id. See also Wanzer v. District of Columbia*, 580 A.2d 127, 132 (D.C.1990) ("If it were otherwise, then the city would be potentially liable for 'every oversight, omission, or blunder' of its official—a liability which potentially could so deplete the resources necessary to provide police protection, fire protection, and ambulance service as to result in the elimination of those services altogether.").

In addition, our holding recognizes the fact that when emergency services are involved, "the circumstances are often

---

**29.** A number of jurisdictions outside of this State also apply the public duty doctrine to the actions of 911 operators and dispatchers. *See, e.g., Sullivan v. City of Sacramento*, 190 Cal.App.3d 1070, 235 Cal.Rptr. 844 (1987); *Johnson v. District of Columbia*, 580 A.2d 140 (D.C.1990); *Hines v. District of Columbia*, 580 A.2d 133 (D.C.1990); *Wanzer v. District of Columbia*, 580 A.2d 127 (D.C.1990); *City of Rome v. Jordan*, 263 Ga. 26, 426 S.E.2d 861 (1993); *DeLong v. County of Erie*, 60 N.Y.2d 296, 469 N.Y.S.2d 611, 457 N.E.2d 717 (1983); *Bratton v. Welp*, 145 Wash.2d 572, 39 P.3d 959 (2002).

quite demanding and ... some mistakes will occur, even when the service is well organized and conscientiously administered." *DeLong v. County of Erie,* 60 N.Y.2d 296, 469 N.Y.S.2d 611, 457 N.E.2d 717, 722 (1983). As observed in the amicus brief,

> [p]roblems the caller has with language skills or telephone equipment may make communication difficult. Cellular telephone calls often make location verification difficult. The caller's emotional state may affect communication; frequently in emergencies, a caller is ... near hysteria, confronted with a situation that he may have difficulty comprehending himself and that he may have even more difficulty trying to explain to someone else. Some callers provide incomplete or false information. In some cases, the caller is an unwilling witness to, or participant in, the emergency incident and is reticent to provide information the call taker requests. Moreover, the problem that always exists in interpreting someone else's statements is exacerbated because the call taker cannot see what is going on.[30]

Amicus Br., at 9–10. Similar to our holding in *Ashburn* regarding police officers, we conclude here that " 'where every decision to deploy law enforcement [or rescue] personnel is fraught with uncertainty,' " 911 personnel " 'must have broad discretion to proceed without fear of civil liability in the 'unflinching discharge of their duties.' ' " *Ashburn,* 306 Md. at 629, 510 A.2d at 1084 (citation omitted). As the New York Court of Appeals explained in *DeLong,* "[a]llowance must be made for" the demanding circumstances involved in emergency services, and "although any error, however slight, may have

---

**30.** Both cases provide illustrations of some of the difficulties associated with the taking of emergency calls. In *Muthukumarana,* Appellant's "emotional state" affected the quality of the communication between herself and Appellee Woodward reflected in Woodward twice stating that she could "not understand" Appellant because she was "screaming." Likewise, in *Fried,* Respondent Archer's duties were exacerbated by Donte W.'s intentional provision of false information regarding the location of Tiffany and his unwillingness to provide all relevant information, including his name and location.

dire consequences[,] it will not always justify an award for damages." *DeLong,* 469 N.Y.S.2d 611, 457 N.E.2d at 722.

Pursuant to the public duty doctrine, therefore, a 911 employee generally owes no duty in tort for the negligent performance of his or her duties to an individual in need of emergency telephone services. As we explained at *supra* pages 486–88, however, the special duty rule limits the applicability of this doctrine. Specifically, if an individual plaintiff establishes that a 911 employee owed him or her a special duty, based on the existence of a special relationship between the two, the employee may be found liable to the individual in tort for the negligent performance of his or her duties.

In delineating the conditions required to establish a special relationship between a 911 employee and an individual, in order to give rise to possible tort liability sufficient to overcome the public duty doctrine, we have been urged not to apply the test used for police officers in *Ashburn, see supra* pages 487–88, and to adopt instead a more specific, categorical list of questions or factors to guide making such decisions. A number of other jurisdictions have developed such formulaic approaches to determining whether a special relationship exists between various public employees and private individuals. For instance, in New York, in order to establish a special relationship and defeat the protection of the public duty doctrine, a plaintiff must demonstrate four distinct factors:

> (1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking.

*Grieshaber v. City of Albany,* 279 A.D.2d 232, 720 N.Y.S.2d 214, 215 (2001) (quoting *Cuffy v. City of New York,* 69 N.Y.2d 255, 513 N.Y.S.2d 372, 505 N.E.2d 937, 940 (1987)), *appeal denied,* 96 N.Y.2d 719, 733 N.Y.S.2d 371, 759 N.E.2d 370

(2001). *See also Kircher v. City of Jamestown,* 74 N.Y.2d 251, 544 N.Y.S.2d 995, 543 N.E.2d 443, 446 (1989) (quoting *Cuffy* ). This four factor approach has been explicitly adopted by a number of other jurisdictions, including Michigan (*White v. Beasley,* 453 Mich.308, 552 N.W.2d 1, 4–5 (1996) (noting that the "only special-relationship test adopted in more than one state is the test adopted by the New York Court of Appeals in *Cuffy* " and adopting that test "at least when applied to police officers")), Ohio (*Sawicki v. Ottawa Hills,* 37 Ohio St.3d 222, 525 N.E.2d 468, 478 (1988) (adopting the *Cuffy* "principles for application to cases in Ohio wherein a special duty is alleged")), and West Virginia (*Wolfe v. City of Wheeling,* 182 W.Va.253, 387 S.E.2d 307, 311 (1989) (adopting the *Cuffy* test)). In addition, the Supreme Court of Georgia also embraces most of New York's test, but deletes the third requirement of direct contact between the municipality's agent and the injured party and calls for both justifiable and detrimental reliance in the fourth requirement. *See City of Rome v. Jordan,* 263 Ga. 26, 426 S.E.2d 861, 863 (1993). Indiana, in turn, has adopted Georgia's approach. *See Benton v. City of Oakland City,* 721 N.E.2d 224, 231 n. 12 (Ind.1999) ("[W]e continue to believe that the [*Jordan* ] test is appropriate for determining whether a government unit qualifies for immunity for failure to dispatch emergency services. . . .").

Other jurisdictions ostensibly formulated their own special relationship tests, instead of adopting New York's popular approach. Most, however, retain at least one, if not many, of the same characteristics as New York's test. For example, North Carolina draws heavily on the concept of reliance and requires that, to establish a special relationship, a plaintiff show (1) "an actual promise was made by the police to create a special duty," (2) "that this promise was reasonably relied [upon] by plaintiff," and (3) "that this reliance was causally related to the injury ultimately suffered by plaintiff." *Braswell v. Braswell,* 330 N.C. 363, 410 S.E.2d 897, 902 (1991). Similarly, to invoke the special relationship exception in Washington, a plaintiff must show that (1) "there is some form of privity between the plaintiff and the public entity that differentiates the plaintiff from the general public," (2) "the public

entity made an express assurance to the plaintiff," and (3) "the plaintiff justifiably relied on the assurance." *Bratton v. Welp*, 145 Wash.2d 572, 577, 39 P.3d 959, 961 (2002). *See also Babcock v. Mason County Fire Dist. No. 6*, 144 Wash.2d 774, 30 P.3d 1261, 1268 (2001). In Pennsylvania, the Superior Court elected to focus on the actions of the municipality, explaining that "the individual claiming a 'special relationship' must demonstrate that the police" were (1) "aware of the individual's particular situation or unique status," (2) "had knowledge of the potential for the particular harm which the individual suffered," and (3) "voluntarily assumed, in light of that knowledge, to protect the individual from the precise harm which was occasioned." *Melendez v. City of Phila.*, 320 Pa.Super. 59, 466 A.2d 1060, 1064 (1983).

The approach adopted by South Dakota and Minnesota places weight on the existence of a legislative mandate in deciding whether to recognize a special relationship. Specifically, they provide that there are " 'at least four factors which should be considered' " in determining whether "governmental action creates a duty to individuals," including (1) " 'the state's actual knowledge of the dangerous condition,' " (2) " 'reasonable reliance by person on the state's representations and conduct,' " (3) " 'an ordinance or statute that sets forth mandatory acts clearly for the protection of a particular class of persons rather than the public as a whole,' " and (4) " 'failure by the state to use due care to avoid increasing the risk of harm.' " *E.P. v. Riley*, 604 N.W.2d 7, 12–13 (S.D.1999) (quoting *Cracraft v. St. Louis Park*, 279 N.W.2d 801, 806–07 (Minn.1979)). *See also Tipton v. Town of Tabor*, 538 N.W.2d 783, 787 (S.D.1995) (adopting Minnesota's approach in *Cracraft*). As the Supreme Court of South Dakota explained, "[s]trong evidence concerning any combination of these factors may be sufficient to impose liability on a government entity." *Tipton*, 538 N.W.2d at 787.

Although many jurisdictions have adopted specific, step-by-step guidelines for determining whether a special relationship exists, there are some jurisdictions which continue to rely on more general considerations, as we did in *Ashburn*. In Cali-

fornia, "when the state, through its agents, voluntarily assumes a protective duty toward a certain member of the public and undertakes action on behalf of that member, thereby inducing reliance, it is held to the same standard of care as a private person or organization." *Williams v. State*, 34 Cal.3d 18, 192 Cal.Rptr. 233, 664 P.2d 137, 140 (1983). Likewise, in the District of Columbia, "in order to convert a duty owed to the general public into a special duty," a plaintiff must demonstrate "a specific undertaking to protect a particular individual ... [and a] justifiable reliance by the plaintiff." *Morgan v. District of Columbia*, 468 A.2d 1306, 1314 (D.C.1983). *See also Johnson v. District of Columbia*, 580 A.2d 140, 142 n. 2 (D.C.1990) (quoting *Morgan*); *Hines v. District of Columbia*, 580 A.2d 133, 138 (D.C.1990). In Tennessee, there are a number of general alternative means of establishing a special relationship, including a test similar to our approach in *Ashburn* and one requiring the existence of statutory provisions. Specifically, "a special duty of care exists" in Tennessee when (1) "officials, by their actions, affirmatively undertake to protect the plaintiff, and the plaintiff relies upon the undertaking," (2) "a statute specifically provides for a cause of action against an official or municipality for injuries resulting to a particular class of individuals, of which the plaintiff is a member, from failure to enforce certain laws," or (3) "the plaintiff alleges a cause of action involving intent, malice, or reckless misconduct." *Ezell v. Cockrell*, 902 S.W.2d 394, 402 (Tenn.1995).

█ Although we acknowledge that a more formulaic special relationship test may facilitate greater predictability, our review of the many different special relationship requirements adopted by other jurisdictions reinforces our choice not to incorporate a more regimented approach into Maryland's special relationship test. We continue to believe that "the intent of the 'special relationship' doctrine is better addressed by our general standard outlined in *Ashburn*" because it preserves our ability to determine "whether a special relationship exists" on a "case-by-case basis." *Williams*, 359 Md. at 150, 753 A.2d at 67–68. Therefore, after incorporating 911 personnel into

the purview of the public duty doctrine, we also find that the special relationship test in *Ashburn* is the appropriate analytical paradigm to be used in evaluating work-related negligence claims against 911 personnel. Under that test, in order for a special relationship between a 911 employee and a person in need of assistance to exist, it must be shown that the 911 employee affirmatively acted to protect or assist the specific individual, or a specific group of individuals like the individual, in need of assistance, thereby often inducing the specific reliance of the individual on the employee.[31] *See Ashburn*, 306 Md. at 631, 510 A.2d at 1085. Absent the existence of those factors, a special relationship may not be found to exist between the employee and the individual, and a 911 employee may not be held liable in tort to an individual.

---

**31.** The Court of Special Appeals in *Fried* defined "specific reliance" under this test as meaning "detrimental and justifiable reliance." Many other jurisdictions likewise have described the reliance necessary to create a special relationship as being justifiable and/or detrimental. *See, e.g., Johnson*, 580 A.2d at 142 n. 2 (requiring "justifiable reliance" in the District of Columbia); *Hines*, 580 A.2d at 138 (same); *Morgan*, 468 A.2d at 1314 (same); *Jordan*, 426 S.E.2d at 863 (requiring "justifiable and detrimental reliance" in Georgia); *Benton v. City of Oakland City*, 721 N.E.2d 224, 231 n. 12 (Ind.1999) (requiring "justifiable and detrimental reliance" in Indiana); *White v. Beasley*, 453 Mich. 308, 552 N.W.2d 1, 5 (1996) (requiring "justifiable reliance" in Michigan); *Grieshaber v. City of Albany*, 279 A.D.2d 232, 720 N.Y.S.2d 214, 215 (2001) (requiring "justifiable reliance" in New York); *Kircher v. City of Jamestown*, 74 N.Y.2d 251, 544 N.Y.S.2d 995, 543 N.E.2d 443, 446 (1989) (same); *Cuffy v. City of New York*, 69 N.Y.2d 255, 513 N.Y.S.2d 372, 505 N.E.2d 937, 940 (1987) (same); *Sawicki v. Ottawa Hills*, 37 Ohio St.3d 222, 525 N.E.2d 468, 478 (1988) (requiring "justifiable reliance" in Ohio); *Bratton*, 145 Wash.2d at 578, 39 P.3d at 961 (requiring a plaintiff "justifiably rely" in Washington); *Babcock*, 30 P.3d at 1268 (same); *Wolfe v. City of Wheeling*, 182 W.Va. 253, 387 S.E.2d 307, 311 (1989) (requiring "justifiable reliance" in West Virginia). We have chosen, however, to retain a more general special relationship test to preserve our case-by-case analytical approach to these issues. Although reliance may be a factor under that test, there may be many cases in which reliance is irrelevant to the analysis, such as here. Therefore, adopting a limited definition of "specific reliance" is not warranted or necessary in the present cases. In spite of the fact that we do not find it necessary to limit our interpretation of "specific reliance" to detrimental and justifiable reliance, we do recognize that those principles, along with others, may provide useful tools for assessing reliance, where necessary in a particular case.

## V.

Having completed our general analysis of the consolidated issues, we must now apply our conclusions to the specific cases before us. Our task, however, is limited to addressing the second part of the final issue presented. Specifically, because we have determined that the Court of Special Appeals in *Fried* and the Circuit Court for Montgomery County in *Muthukumarana* did not err in applying the special relationship test to 911 employees, *see supra* Part IV.C., we are left only to determine whether those courts erred in holding that the employees in question had no special relationship with or duty to the individual victims.

### A. Fried

Petitioner Fried's theory of Respondent Archer's negligence was that Archer breached her duty of care by failing to adequately question Donte W., erroneously reporting to Deputy Thomas that Tiffany was behind "J" Court, instead of "K" Court, and failing to report that Tiffany was located near a "forested area." Although Fried maintains in the first instance that the Court of Special Appeals erred in determining that the tort duty owed from emergency dispatch telephone personnel to individual callers or victims is governed by the special relationship rule, in the alternative she appears to argue that a special relationship existed between Respondent Archer and Tiffany. While she does not state explicitly that a "special relationship" (in those words) existed between Archer and Tiffany, she does assert that Donte W.'s "reliance on Archer's affirmative statements" to him was justifiable and that sufficient detrimental "reliance on behalf of the caller did take place, and should therefore be transferred to [Tiffany]." As to Respondent Terrell, Fried alleges that he negligently employed improper procedures and/or failed to properly train Archer. According to Fried, Terrell had a special relationship with Tiffany based on the foreseeability that "improper procedures" and inadequate training would cause "harm to those relying on the system."

In reply, both Respondents maintain that there is no "allegation of conduct" which could have "induced Tiffany[']s specific reliance." Quoting from the Court of Special Appeals opinion, they contend that Tiffany "did not 'specifically rely' upon [Archer's] promise to send police assistance as 'Tiffany did not call for help, did not know that the callers had done so, did not know that Archer had promised to send someone out, and did not 'choose' to stay outside in reliance on that promise . . . .' " *Fried,* 139 Md.App. at 267, 775 A.2d at 452. In addition, they also argue that Tiffany's "criminal assailants" did not rely on "Archer's promise to send police," and assert that we "should not apply the special relationship analysis to individuals who create the peril."

Pursuant to the standards set forth in *supra* Part IV.C., our analysis in this case begins with a determination of whether Archer acted to protect or assist Tiffany, or a specific group of individuals like Tiffany. Fried would have us interpret Archer's receipt of Donte W.'s call, her conversation with him regarding the unnamed girl that was Tiffany, and her statement that the dispatch system would "send someone out," as sufficient to constitute an affirmative act on her part to protect or assist Tiffany. We, however, agree with the Court of Special Appeals that "neither a dispatcher's receipt of a call for help nor the dispatch of emergency assistance alone creates a special duty to the person in need of such assistance." *Fried,* 139 Md.App. at 260, 775 A.2d at 448. *See also Morgan,* 468 A.2d at 1313 (finding that a special relationship is not created "when the police gratuitously promise to provide protection. . . . Reassuring a citizen victimized by criminal conduct that help is on the way certainly does not mean that at all costs the action promised inexorably must follow. . . ."); *Hines,* 580 A.2d at 136 ("[T]he mere fact that an individual has emerged from the general public and become an object of the special attention of public employees does not create a relationship which imposes a special legal duty."); *Koher v. Dial,* 653 N.E.2d 524, 526 (Ind.Ct.App.1995) ("Standing alone, a governmental entity's dispatch of emergency services does not create a private duty."). In this case, therefore, where there

is no indication that Archer's handling of Donte W.'s call exceeded or was markedly different than her handling of other similar calls and situations, we shall not find an action on Archer's part to protect or assist Tiffany sufficient to impose a special duty in tort on Archer for her alleged negligent handling of the dispatch from the call. *See Wanzer*, 580 A.2d at 132 ("A one-time call to 911 for help is not enough to establish a special relationship.... To give rise to a special relationship, the agency's response to the private party must in some demonstrable way exceed the response generally made to other members of the public."). To hold otherwise would circumvent wholly our extending protection to 911 personnel in the " 'unflinching discharge' of their duties' " to the general public. *Ashburn*, 306 Md. at 629, 510 A.2d at 1084 (citation omitted).

Likewise, we also are unable to conclude that Archer's answering and handling of Donte W.'s call constituted an act to protect or assist a specific group of individuals like Tiffany. Pursuant to Md.Code (1957, 1997 Repl.Vol.), Art. 41, §§ 18–101–18–102, "all counties" must "have in operation an enhanced 911 system," including "police, fire fighting, and emergency ambulance services" (§§ 18–102(a), (c)), to protect "the safety and well-being of the citizens of Maryland." § 18–101(a).[32] By its terms, this statutory scheme does not create an emergency system to benefit a discrete group of persons. Rather, in providing for such broad services, it recognizes that, at different times, any and all citizens of, or visitors in, Maryland may find it necessary to utilize that system for innumerable purposes. In our view, acting to protect or assist a "specific group of individuals," sufficient to create a special relationship, involves more than general actions taken to serve members of the public at large in need of emergency telephone services. To find otherwise, by equating a duty to act with the provision of a general public service, might jeopardize

---

32. This statute does not serve to characterize the employment of a 911 operator or dispatcher as positions "created by law" as the term is used in the analysis of public official immunity.

the availability of those services in the first instance. *See Wanzer*, 580 A.2d at 132; *Fried*, 139 Md.App. at 258, 775 A.2d at 447. Absent the existence of an affirmative action on Archer's part to protect Tiffany or a specific group of individuals like Tiffany, a special duty in tort may not be imposed on Archer for her handling of the dispatch from Donte W.'s call. As a result, it is unnecessary for us to determine whether the facts of this case satisfy the second prong of the special relationship test.

 Finally, we are unwilling to conclude that Terrell owed a special duty in tort to Tiffany. Accepting as true Fried's allegations, there is no indication that Terrell's alleged failure to establish proper policies and to train adequately Archer constituted an affirmative action to assist or protect Tiffany. Fried provides no evidence of any action taken by Terrell in this case in excess of or substantially different than his actions towards other individuals in need of 911 assistance. In addition, Terrell's general employment duties with the HCSO fail to create a duty to a "specific group of individuals" like Tiffany. Pursuant to the Harford County Code, Terrell administers the Harford County Division of Emergency Operations, which is responsible, in part, for "[r]eceiving and handling all 911 telephone calls in the county." Harford County Code, Ch. 9, Art. XXXVI, §§ 9–200–9–201. As we earlier stated, acting to protect or assist a "specific group of individuals," requires more than general actions taken to serve all members of the public in need of emergency telephone services. Because Terrell's actions fail to satisfy the first prong of the special relationship test, Terrell owed no individual duty to Tiffany.

### B. *Muthukumarana*

Appellant Muthukumarana alleged that Appellee Woodward negligently failed to advise her to leave her home and to call back from a safe location. Although Muthukumarana maintains, as her flagship issue, that the Good Samaritan doctrine should apply in this case, she also argues alternatively that the existence of a special relationship "is at the least a question of

material fact." *But see supra* pages 471–73 (explaining that in summary judgment cases where there is no genuine dispute of material facts, the determination of whether a special relationship exists is a question of law). Muthukumarana contends that "[b]y asking the particular questions that she asked, Woodward affirmatively kept [Appellant] on the telephone . . . when she should have been directed to flee pursuant to the S[tandard] O[perating] P[rocedure]," and also suggests that she "is distinguished from most members of the public at large" because she "received an Instruction Sheet from the County which directed her to call 911 if she had reason to fear for her immediate safety." According to Muthukumarana, her "specific reliance on the assistance of Woodward . . . increased her peril by keeping her [and inferentially her children] in harm's way and by causing [them] to forgo other methods of assistance."

On the other hand, Woodward contends that Muthukumarana would have us "infer an affirmative act by Woodward and specific reliance by Muthukumarana merely because Woodward answered the phone and asked questions," and explains that a special relationship should not be formed based on " 'a call for assistance' " or " 'the dispatch of such assistance.' " (Quoting *Fried*, 139 Md.App. at 254, 775 A.2d at 444). In addition, Woodward argues that a special relationship was not formed "merely because Appellant Muthukumarana [previously] received an instruction sheet . . . directing her to call 911 . . ." and notes that "Muthukumarana did not rely upon any affirmative assurances by Woodward."

█ In this case, it is unnecessary for us to determine whether a special relationship existed between Woodward and, through Appellant, Emil and Budrani because, regardless of whether Woodward owed an individual duty in tort to Appellant, Emil and/or Budrani, the undisputed facts of this case (in the form of the tape recorded 911 call) fail to indicate any evidence of negligence on Woodward's part. According to Montgomery County's Standard Operating Procedure ("SOP") for responding to a domestic violence call, Woodward's initial

duties were to determine if there were any injuries on the scene, whether weapons were present, whether the caller was the victim or a witness, where the assailant was located, and whether drugs or alcohol were involved. *See supra* note 11. If, after obtaining this information and sending it to dispatch, Woodward determined that the caller was in "immediate danger," she then was supposed to advise the caller to leave the scene. *Id.* A review of the transcript of the conversation between Woodward and Muthukumarana reveals that Woodward did not deviate from the terms of the SOP. Upon receipt of the call, she obtained the address of the home where the disturbance was located, immediately classified the call as "domestic violence," and sent it on to dispatch. She then attempted to determine, pursuant to the SOP, who was involved in the domestic incident, where Muthukumarana's husband was located, whether there were any weapons in the home, and whether her husband had a weapon in his possession. Unfortunately, while Woodward was in the process of obtaining the "pertinent information" and before she had the opportunity to determine if Muthukumarana should and could leave the scene, Mr. Muthukumarana shot his children and then himself. Although the sequence of events in this case are tragic, there is no indication that Woodward acted negligently in her handling of the relatively brief call.

██ Even if Woodward were deemed negligent in her handling of Muthukumarana's call, we nonetheless could not find in Appellant's favor because the circumstances of this case fail to meet the first prong of the special relationship test—an action taken to protect or assist Emil or Budrani or a specific group of individuals like Emil and Budrani.[33] The record and the tape recorded 911 call provide no indication

---

33. Appellant Muthukumarana's arguments regarding the special relationship test focus on Woodward's alleged actions towards her and Muthukumarana's alleged reliance on Woodward. This case, however involves a wrongful death and survival action for her two children, Emil and Budrani. Our focus, therefore, is on the existence or lack of a special relationship between Woodward and Emil and Budrani, not between Woodward and Muthukumarana.

that Woodward took any action to protect or assist Emil and Budrani directly. And, as we explained at *supra* pages 499–501, Woodward's receipt of the call alone did not create a special duty to Emil and Budrani. *See Fried*, 139 Md.App. at 260, 775 A.2d at 448 ("[N]either a dispatcher's receipt of a call for help nor the dispatch of emergency assistance alone creates a special duty to the person in need of such assistance."). Likewise, Woodward's mere handling and answering of the 911 call from Muthukumarana, requesting assistance as a member of the general public, did not constitute an act to protect or assist a "specific group of individuals" such as Emil and Budrani. *See supra* pages 500–01.

■ Finally, Muthukumarana's receipt of the information/instruction sheet suggesting that she call 911 if she feared for her safety did not create a special duty flowing from Woodward to Emil and Budrani. The information/instruction sheet was not designed or intended to increase the obligation of the Montgomery County Communication Center or set apart its duties to Appellant or other individuals receiving *ex-parte* orders for protection from domestic violence. Rather, the sheet's stated purpose was to inform individuals receiving *ex-parte* orders of the process involved in serving those orders and the nature of *ex-parte* orders in general. By its own terms, it was provided to "help [the recipient] better understand what role [the Montgomery County Sheriff's] Office and the Montgomery County Police may play in executing [the recipient's] order and how [the recipient] can assist." While the sheet explained that an individual should call 911 if he or she had reason to fear for his or her safety, that provision was simply a reminder of the services available to the public from the existing emergency telephone system in Montgomery County, not an exceptional or variant extension of service to a certain group of individuals. Because Muthukumarana's receipt of the information/instruction sheet is insufficient to establish a special relationship between herself and Woodward, it likewise does not create one, by extension, between Woodward and Emil and Budrani. Therefore, even if Wood-

ward had handled negligently Muthukumarana's call, she would owe no individual duty in tort to Emil and Budrani because her actions fail to satisfy the first prong of the special relationship test.

*MUTHUKUMARANA, CASE NO. 83: JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED; APPELLANT TO PAY COSTS.*

*FRIED, CASE NO. 84: JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; PETITIONER TO PAY COSTS.*

BELL, Chief Judge, dissents.

Dissenting Opinion by BELL, Chief Judge.

The "911 system"[1] is an emergency system intended by the General Assembly to enhance, in recognition of their paramount importance, the safety and well-being of the citizens of Maryland by ensuring that timely and appropriate assistance is rendered when the lives or property of those citizens are in imminent danger. Maryland Code (1957, 1997 Replacement Volume, 2001 Cum.Supp.) Article 41, § 18–101(a).[2] Recognizing that a multiplicity of emergency telephone numbers exists throughout the State and, indeed, within any given county and that the telephone is the usual mode by which emergency assistance is summoned, § 18–101(b), and "concerned that avoidable delays in reaching appropriate emergency aid are occurring to the jeopardy of life and property," § 18–101(c), to achieve this purpose, the General Assembly "establish[ed] the

---

1. Maryland Code (1957, 1997 Replacement Volume, 2001 Cum. Sup.) Article 41, § 18–101(f)(5) defines "911 system" as "a telephone service which meets the planning guidelines established pursuant to § 18–103 ..., and which automatically connects a person dialing the digits 911 to an established public safety answering point. 911 system includes equipment for connecting and outswitching 911 calls within a telephone central office, trunking facilities from the central office to a public safety answering point, and equipment to connect 911 calls to the appropriate public safety agency."

2. Hereinafter, unless otherwise indicated, future statutory references will be to this article and chapter.

three digit number, 911, as the primary emergency telephone number for the State of Maryland and ... provide[d] for the orderly installation, maintenance, and operation of 911 systems within the State." *See* § 18–101(e). In so doing, it "acknowledge[d] that the three digit number, 911, is a nationally recognized and applied telephone number which may be used to summon emergency aid and to eliminate delays caused by lack of familiarity with emergency numbers and by understandable confusion in circumstances of crisis." *See* § 18–101(d).

The 911 system is required, in an enhanced form,[3] in all counties and Baltimore City after July 1, 1995. *See* § 18–102(a). The service through the system must include police, fire fighting, and emergency ambulance services and, at the discretion of the county or counties being served by the system, other emergency and civil defense services. *See* § 18–101(c). While a public safety agency whose services are available on the 911 system may maintain a separate secondary backup number for emergency calls, § 18–102(d), "[a]ny educational information relating to emergency services made available by the State or a county shall designate the number 911 as the primary emergency number," even though it also may include a separate secondary backup number for emergency calls. *See* § 18–101(e). It thus is very clear that 911 is the option to be promoted for emergencies. More telling, competition with the 911 system simply is not permitted. Md Code (1999) § 15–126(c)(1) provides:

"(c) Insurer prohibited from engaging in competition with 911 emergency system.—

"(1) An entity subject to this section may not establish or promote an emergency medical response and transporta-

---

3. An "enhanced 911" system is:
 "a 911 system that provides:
 "(i)Automatic number identification;
 "(ii)Automatic location identification; and
 "(iii)After July 1, 1995, other future technological advancements that the Board may require."
 Section 18–101(f)(6).

tion system that encourages or directs access by an insured or enrollee in competition with or in substitution of the Maryland Emergency Medical Services System (911) or other State, county, or local government emergency medical services system."

The system is not free. The General assembly authorized a 911 fee, 10 cents per month payable at the time when the bills for telephone service are due, to be paid by the subscribers to 911–accessible service, including switched local exchange access service and wireless telephone service, § 18–105(b)(1), to be included in a 911 Trust Fund, out of which are to paid reimbursements to the counties for enhancements to a 911 system and expenditures to contractors in accordance with the provisions of § 18–103(h)(11). *See* § 18–105(a). It also authorized:

> "(c)(1) In addition to the 911 fee imposed by [§ 18–105(b)(1) ], the governing body of each county [to] by ordinance or resolution after public hearing enact or adopt an additional charge not to exceed 50 cents per month to be applied to all current bills rendered for switched local exchange access service, wireless telephone service, or other 911–accessible service within that county. The amount of the additional charge may not exceed a level necessary to cover the total amount of eligible operation and maintenance costs of the county."

Section 18–105(c)(1).

The 911 emergency system handles emergency calls for police, fire, and medical assistance and it is designed to do so in a more efficient and expedient manner. Thus, while not the police department or the emergency care provider, it provides a more limited, but nonetheless important, function, "as a clearinghouse for all emergency calls for assistance." *Elvera Trezzi v. City of Detroit*, 120 Mich.App. 506, 328 N.W.2d 70, 74 (1982)(Benson, J., dissenting). Because established for the purpose of ensuring the provision of emergency assistance to the public, it is logical, as one court has opined, to assume that "once a municipality receives a call for help through the 911

system, it is obligated to perform in a proper and reasonable manner"; " 'that by accepting the call and agreeing to respond, the municipality had now narrowed a public duty to a special duty to that individual.' " *Merced, Administratrix v. City of New York,* 142 Misc.2d 442, 444, 534 N.Y.S.2d 60, 61 (Sup.Ct.1987), quoting Comment, "911" Emergency Assistance Systems, 8 Geo. Mason L. Rev 103, 121 (1985).

Like the Court of Special Appeals, noting the integral link between the 911 operator's duties and the delivery of emergency services, citing *Fried v. Archer,* 139 Md.App. 229, 257, 775 A.2d 430, 446, *cert. granted,* 366 Md. 246, 783 A.2d 221 (2001), the majority holds that " 'it is appropriate to measure' [the 911 operators'] negligence liability, as well as the liability of their managers and supervisors, 'by the same standard applied to the police officers who respond to their dispatches.' " *Muthukumarana v. Montgomery County,* 370 Md. 447, 489–90, 805 A.2d 372, 397–98 (2002), quoting *Fried,* 139 Md. App. at 257, 775 A.2d at 446. That standard is embodied, it concludes, in the "public duty doctrine." Under that doctrine, the majority explains:

> "when a statute or common law "imposes upon a public entity a duty to the public at large, and not a duty to a particular class of individuals, the duty is not one enforceable in tort." DAN B. DOBBS, THE LAW OF TORTS § 271 (2000) (footnote omitted). As we explained in *Ashburn* [*v. Anne Arundel County,* 306 Md. 617, 510 A.2d 1078 (1986) ] the "duty owed by the police by virtue of their positions as officers is a duty to protect the public." *Ashburn,* 306 Md. at 628, 510 A.2d at 1084. Pursuant to the doctrine, therefore, police officers ordinarily may not be held liable for failure to protect specific persons because they owe no duty, as the first element of a negligence action requires, to those individuals."

*Id.* at 486–87, 805 A.2d at 395–96 (footnote omitted).

Accordingly, the majority also holds that "absent a special relationship between a 911 employee and an individual in need of the telephone services, an employee does not owe such an

individual a private duty in tort," *id.* at 486, 805 A.2d at 395, and, consistently with courts in other States,[4] that "the legal duty owed by 911 employees 'by virtue of their position, is [also] a *public* duty to aid.' " *Id.* at 490, 805 A.2d at 397–98.[5] More particularly, the majority states:

> "Pursuant to the public duty doctrine, therefore, a 911 employee generally owes no duty in tort for the negligent performance of his or her duties to an individual in need of emergency telephone services.... [T]he special duty rule limits the applicability of this doctrine. Specifically, if an individual plaintiff establishes that a 911 employee owed him or her a special duty, based on the existence of a special relationship between the two, the employee may be found

---

**4.** As the majority points out, the public duty doctrine has been applied to the actions of 911 operators and dispatchers. *See, e.g., Sullivan v. City of Sacramento,* 190 Cal.App.3d 1070, 235 Cal.Rptr. 844 (1987); *Johnson v. District of Columbia,* 580 A.2d 140 (D.C.1990); *Hines v. District of Columbia,* 580 A.2d 133 (D.C.1990); *Wanzer v. District of Columbia,* 580 A.2d 127 (D.C.1990); *City of Rome v. Jordan,* 263 Ga. 26, 426 S.E.2d 861 (1993); *DeLong v. County of Erie,* 60 N.Y.2d 296, 469 N.Y.S.2d 611, 457 N.E.2d 717 (1983); *Bratton v. Welp,* 145 Wash.2d 572, 39 P.3d 959, 961 (2002).

**5.** The majority reasons, as the Court of Special Appeals explained in *Fried v. Archer,* 139 Md.App. 229, 257, 775 A.2d 430, 446, *cert. granted,* 366 Md. 246, 783 A.2d 221 (2001):

> " " '[F]or the courts to proclaim a new and general duty of protection in the law of tort, even to those who may be the particular seekers of protection based on specific hazards, could and would inevitably determine how the limited police resources of the community should be allocated and without predictable limits.' " *Fried,* 139 Md.App. at 258, 775 A.2d at 447 (quoting *Riss v. City of New York,* 22 N.Y.2d 579, 293 N.Y.S.2d 897, 240 N.E.2d 860, 861 (1968)). By applying the public duty doctrine to 911 personnel, we are able to prevent "that new and general duty of protection" from resulting "in the reduction of public safety services, including emergency response programs and personnel, to the community." *Id. See also Wanzer v. District of Columbia,* 580 A.2d 127, 132 (D.C.1990) ("If it were otherwise, then the city would be potentially liable for 'every oversight, omission, or blunder' of its official-a liability which potentially could so deplete the resources necessary to provide police protection, fire protection, and ambulance service as to result in the elimination of those services altogether.").' "

370 Md. at 490–91, 805 A.2d at 397–98.

liable to the individual in tort for the negligent performance of his or her duties."

*Id.* at 491–92, 805 A.2d at 398–99. Critical to the majority's analysis is the absence of a duty owed by the 911 operators to the victims in these cases.

I agree that the crucial inquiry is whether there was a duty owed in these cases, for it is true that absent a duty of care, there can be no liability in negligence. *See Walpert, Smullian & Blumenthal, P.A. v. Katz,* 361 Md. 645, 655, 762 A.2d 582, 587 (2000). In *West Va. Central v. Fuller,* 96 Md. 652, 666, 54 A. 669, 671–72 (1903), we were explicit:

> "[T]here can be no negligence where there is no duty that is due; for negligence is the breach of some duty that one person owes to another.... As the duty owed varies with circumstances and with the relation to each other of the individuals concerned, so the alleged negligence varies, and the act complained of never amounts to negligence in law or fact, if there has been no breach of duty."

I do not agree, as the majority concludes, that no duty of care was owed by the 911 operators in these cases to the appellees and the respondents.[6]

---

**6.** The majority rejects the applicability of the good Samaritan rule in favor of, as we have seen, the public duty doctrine. I do not quarrel with that decision, the approach it adopts being the one followed by other courts that have faced the issue. *See* note 4, supra. In truth, however, the logic of the distinction that is being drawn between the two approaches escapes me. This Court commented in *Ashburn v. Anne Arundel Co.,* 306 Md. 617, 631, 510 A.2d 1078, 1085 (1986), that "[t]his 'special duty rule,' as it has been termed by the courts, is nothing more than a modified application of the principle that although generally there is no duty in negligence terms to act for the benefit of any particular person, when one does indeed act for the benefit of another, he must act in a reasonable manner. In order for a special relationship between police officer and victim to be found, it must be shown that the local government or the police officer affirmatively acted to protect the specific victim or a specific group of individuals like the victim, thereby inducing the victim's specific reliance upon the police protection."(citations omitted). The Supreme Court of Minnesota, in *Cracraft v. City of St. Louis Park,* 279 N.W.2d 801, 806 (1979), made the same point:

> " 'Special duty' is nothing more than convenient terminology, in contradistinction to 'public duty,' for the ancient doctrine that once a

In Maryland, establishment of a cause of action for negligence requires that a plaintiff prove: a duty owed to the plaintiff or to a class of which the plaintiff is a part; a breach of that duty; a causal relationship between the breach and the harm; and damages suffered. *Katz,* 361 Md. at 655, 762 A.2d at 587. *See Jacques v. First Nat'l Bank,* 307 Md. 527, 531, 515 A.2d 756, 758 (1986); *Cramer v. Housing Opportunities Comm'n,* 304 Md. 705, 712, 501 A.2d 35, 39 (1985); *Scott v. Watson,* 278 Md. 160, 165, 359 A.2d 548, 552 (1976); *Peroti v. Williams,* 258 Md. 663, 669, 267 A.2d 114, 118 (1970).

The first element is "duty," the foundation of a negligence action and the predicate upon which such action is founded. *Ashburn v. Anne Arundel County,* 306 Md. 617, 627, 510 A.2d 1078, 1083 (1986). In negligence cases, "duty is always the same—to conform to the legal standard of reasonable conduct in the light of the apparent risk." W. Page Keeton, Prosser and Keeton on The Law of Torts, § 53, at 356 (5th ed.1984). Analyzing this element, Judge Cole, for the Court, pointed out:

" 'Duty' in negligence has been defined as 'an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another.' ...

---

duty to act for the protection of others is voluntarily assumed, due care must be exercised even though there was no duty to act in the first instance.... 'Special duty,' therefore, could also effectively be termed 'assumed' duty."

(Citation omitted). RESTATEMENT (SECOND) OF TORTS § 323 (1965), on which the appellants and the petitioner rely, provides:

" § 323 Negligent Performance of Undertaking to Render Services. One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking."

I agree with the majority's rejection of the the argument made by the appellees and the respondent that 911 operators are public officials entitled to public official immunity.

There is no set formula for this determination. As Dean Prosser noted, 'duty is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection.' ... In broad terms, these policies include: 'convenience of administration, capacity of the parties to bear the loss, a policy of preventing future injuries, [and] the moral blame attached to the wrongdoer....' "

*Id.* (quoting W. Page Keeton, Prosser and Keeton on The Law of Torts, § 53, at 164 (5th ed.1984)). *See Brown v. Dermer,* 357 Md. 344, 357, 744 A.2d 47, 54 (2000); *Rosenblatt v. Exxon Co., U.S.A.,* 335 Md. 58, 76–77, 642 A.2d 180, 189–90 (1994); *Erie Ins. Co. v. Chops,* 322 Md. 79, 84, 585 A.2d 232 (1991); *Jacques v. First Nat. Bank of Maryland,* 307 Md. 527, 532, 515 A.2d 756, 758–59 (1986). "In other words, 'duty' is a question of whether the defendant is under any obligation for the benefit of the particular plaintiff." Prosser and Keeton, supra. at 356. *See Valentine v. On Target, Inc.,* 353 Md. 544, 550, 727 A.2d 947, 949 (1999).

Among the variables to be considered in determining whether a duty to another exists, we have said, are:

"the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered the injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved."

*Ashburn,* 306 Md. at 627, 510 A.2d at 1083, quoting *Tarasoff v. Regents of University of California,* 17 Cal.3d 425, 131 Cal. Rptr. 14, 551 P.2d 334, 342 (1976). Inherent also in the concept of duty is that there be a relationship between the parties, out of which the duty arises. *Rosenblatt v. Exxon,* 335 Md. at 77, 642 A.2d at 189. As among these, we have stated that the factor deemed most important is foreseeability,

*see id.*, although we have cautioned that "foreseeability" must not be confused with "duty," noting:

> "The fact that a result may be foreseeable does not itself impose a duty in negligence terms. This principle is apparent in the acceptance by most jurisdictions and by this Court of the general rule that there is no duty to control a third person's conduct so as to prevent personal harm to another, unless a 'special relationship' exists either between the actor and the third person or between the actor and the person injured. *See Lamb v. Hopkins*, 303 Md. 236, 242–44, 492 A.2d 1297, 1300–01 (1985); Restatement (Second) of Torts § 315 (1965); *Scott v. Watson*, 278 Md. 160, 166, 359 A.2d 548, 552 (1976) ('a private person is under no special duty to protect another from criminal acts by a third person, in the absence of statutes, or of a special relationship.')."

*Ashburn* at 628, 510 A.2d at 1083.

Thus, "[i]n determining the existence of a duty owed to a plaintiff, we have applied a 'foreseeability of harm' test." *Rosenblatt v. Exxon*, 335 Md. at 77, 642 A.2d at 189. To be sure, that test, like the relationship between the parties, is based upon the recognition that a duty must be limited to avoid liability for unreasonably remote consequences. They also serve to more clearly define whether there is a duty and the boundaries of that duty. It is not surprising, therefore, that this Court has acknowledged that a legal duty arises from "the 'responsibility each of us bears to exercise due care to avoid unreasonable risks of harm to others.' " *B.N. v. K.K.*, 312 Md. 135, 141, 538 A.2d 1175, 1178 (1988), quoting *Moran v. Fabergé*, 273 Md. 538, 543, 332 A.2d 11, 15 (1975). After all, "[t]he seriousness of potential harm, as well as its probability, contributes to a duty to prevent it." *Faya v. Almaraz*, 329 Md. 435, 449, 620 A.2d 327, 333 (1993). *See Baltimore Gas and Elec. Co. v. Flippo*, 348 Md. 680, 700, 705 A.2d 1144, 1154 (1998).

I have not the slightest doubt that the 911 operators in these cases owed the victims in these cases a duty of care. As

we have seen, by statute, each of the state's twenty three counties and the City of Baltimore are required to have in place a 911 system, which automatically connects a person dialing 911 to an established public safety answering point, at which police, fire and emergency ambulance service may be accessed. The reason for the requirement, the General Assembly made clear, was to enhance the delivery of such services, to ensure that they were available more readily—accessed more easily—and that they be delivered more efficiently and expeditiously. In fact, in stating the purpose of the legislation, the Legislature pointedly expressed concern for the safety and well-being of the citizens of Maryland and that timely and appropriate assistance—it specifically and emphatically recognized the danger inherent in any delay—be available and provided when an emergency situation places the lives or property of those citizens in imminent danger. Moreover, the legislation provides that educational material regarding the system refer to 911 as the primary emergency number, thus further emphasizing its importance in the emergency response area.

The victims [7] were citizens of Maryland faced with emergencies of the kind to which the 911 system is designed to respond. In each case, the victims' lives were imminently at peril. In each case, the 911 system was utilized in an attempt to obtain appropriate emergency assistance, in a timely manner. In each case, the call was answered, not refused, and the operator was told of the emergency, but in neither instance was there a timely response, consistent with the emergency presented and reported. In each case, the victims suffered damage; in each instance, they died or were killed. In each case, this result was not only foreseeable, but, without immediate intervention, predictable.

The State having established, mandated, funded and provided oversight for a 911 system expressly for the purpose of

---

7. In these cases, given the result the majority opinion requires, they were arguably twice victimized, first by the actual perpetrators of the harm and then by the 911 system operators who responded negligently.

preventing avoidable delays in the delivery of emergency services and to protect the lives and property of its citizens, neither it nor any of the counties or Baltimore City reasonably may contend that a 911 system does not owe a duty to a person who avails him or herself of that system, that something more than a call for assistance is necessary to create the special relationship required to permit recovery for damages incurred as a result of the 911 operator's negligence. In fact, such a position is, to be quite blunt, nonsensical.

To be sure, perhaps neither the State nor any of the subdivisions were required to provide a 911 system; however, the State has chosen to do so and to impose the obligation on its subdivisions. Of course, when the choice was made to assume the 911 obligation, we have made clear, it carried with it the obligation to ensure that the obligation is discharged, or executed, in a reasonable manner. *Ashburn*, 306 Md. at 631, 510 A.2d at 1085. *See Scott v. Watson*, 278 Md. 160, 170–71, 359 A.2d 548, 555 (1976); *Pennsylvania R.R. Co. v. Yingling*, 148 Md. 169, 129 A. 36 (1925). Moreover, the system chosen invited, and, indeed, encouraged the citizens to utilize the system, holding out the promise that their calls for help would be promptly and efficiently handled, with the result that the potential losses precipitating the calls would be ameliorated or moderated. That invitation, encouragement and, most important, promise of an appropriate and timely response provide the predicate for a special relationship from which a duty flows. All that is required to finalize that relationship is a call from a citizen in need of, or on behalf of someone in need of, the assistance offered and promised. *Austin v. City of Scottsdale*, 140 Ariz. 579, 684 P.2d 151, 154 (1984) (failure to act immediately on an emergency call, even though it was anonymous); *DeLong v. County of Erie*, 60 N.Y.2d 296, 469 N.Y.S.2d 611, 457 N.E.2d 717, 721–22 (1983); *Bratton v. Welp*, 145 Wash.2d 572, 39 P.3d 959, 961 (2002); *St. George. v. Deerfield*, 568 So.2d 931, 932 (Fla.App.1990); *Hancock v. City of New York*, 164 Misc.2d 122, 623 N.Y.S.2d 63, 67 (N.Y.Sup. Ct.1994); *Merced, Administratrix v. City of New York*, 142 Misc.2d 442, 444, 534 N.Y.S.2d 60, 61 (Sup.Ct.1987). *See In the Interest Of: J.B.*, 621 So.2d 489, 490–91 (Fla.App.1993) ("A

911 call is a cry to the authorities for help. And until the investigating officer is reasonably satisfied that no emergency exists, he is within his legal duty to investigate such calls in a manner consistent with their emergency nature").

*DeLong* was a wrongful death action brought by the estate of a woman who was killed by a burglar after she had called 911 and received assurances that help was being dispatched. It alleged that the call was negligently processed and, so, negligently responded to. The Court held that by creating a special service, accepting the call for emergency assistance and assuring the caller that help was on the way established a special relationship with, and duty to, the caller. 469 N.Y.S.2d 611, 457 N.E.2d at 721. What the Court of Appeals of New York had to say about the predicate for liability in *DeLong* is particularly apropos this case:

'In this case the decision had been made by the municipalities to provide a special emergency service which was intended and proclaimed to be more efficient than normal police services. Those seeking emergency assistance were advised not to attempt to call the general number for the local police, which ironically might have avoided the tragedy encountered in this case, but were encouraged to dial the 911 number to obtain a quicker response. In addition, and most significantly, the victim's plea for assistance was not refused. Indeed she was affirmatively assured that help would be there 'right away'. Considering the fact that she was merely a block and a half from the local police station, and was not yet at the mercy of the intruder, it cannot be said as a matter of law that this assurance played no part in her decision to remain in her home and not seek other assistance. Unfortunately, it only increased the risk to her life."

*Id.*[8]

In *Bratton*, reversing the judgment of the intermediate appellate court, the Supreme Court of Washington explained

---

**8.** The majority relies on the last portion of the quoted passage, that speaking to the victim's reliance on the assurances of the 911 operator,

the application of the public duty rule in that State, with particular emphasis on the reliance element:

> "To establish [public duty] exception, the plaintiff must show that there is some form of privity between the plaintiff and the public entity that differentiates the plaintiff from the general public, that the public entity made an express assurance to the plaintiff, and that the plaintiff justifiably relied on the assurance. Privity should be construed broadly, and, in cases based on failure by the police to timely respond to requests for assistance, it refers to the relationship between the public entity and a reasonably foreseeable plaintiff."

39 P.3d at 961.[9]

Similarly, with respect to incapacitated victims, it is the foreseeability of the harm and the victim that controls, not whether that victim specifically relied upon, or even knew of, the call to 911. *See Merced, v. New York*, 142 Misc.2d 442, 445–46, 534 N.Y.S.2d 60, 62 (Sup.Ct.1987) ("Realistically, an individual who is in dire need of assistance is often too incapacitated to call 911. It is therefore necessary to broaden the general rule so that any caller, who relies on the assurances of the municipality that they are on their way, created

---

to support its "reliance as a factor" analysis. What is significant, but the majority fails to acknowledge, is that that portion negated any argument that the issue in that case could be decided as a matter of law.

9. *But see Laskey v. Martin County Sheriff's Department*, 708 So.2d 1013 (Fla.App.1998). In that case, recovery was denied in the plaintiff's action against the sheriff for negligence in failing timely to forward a 911 call, where the plaintiff's husband was killed in a head-on collision with another vehicle proceeding the wrong way on a limited access interstate highway several minutes after an unidentified 911 caller reported that a vehicle was heading south in a northbound lane of that road. Rejecting the plaintiff's contention that the sheriff's office, in operating the 911 service, had a duty to "dispatch" law enforcement personnel in response to the call and breached that duty by not following its own procedures, the court stated, "Any duty to relay calls regarding traffic offenders is a duty owed the public as a whole and not to any third party who may subsequently be injured by the act of the traffic offender."

the requisite 'special relationship' required to hold a municipality liable."); *Lewis v. City of Indianapolis*, 554 N.E.2d 13(1990).[10] It is, I submit, the invitation to use the system and the holding out of the promise of assistance should the invitation be accepted that triggers reliance. Indeed, there is no reason for there to be a 911 emergency system, and certainly no reason to publicize it, if it was not intended that the citizens use it and rely on it.

The majority maintains that "in order for a special relationship between a 911 employee and a person in need of assistance to exist, it must be shown that the 911 employee affirmatively acted to protect or assist the specific individual, or a specific group of individuals like the individual, in need of assistance, thereby inducing the specific reliance of the individual on the employee."[11] For that proposition, it relies on *Ashburn*, 306 Md. at 631, 510 A.2d at 1085.

Specifically, the majority concludes that "neither a dispatcher's receipt of a call for help nor the dispatch of emergency assistance alone creates a special duty to the person in need of such assistance." 370 Md. at 498, 805 A.2d at 402–03 (quoting *Fried*, 139 Md.App. at 260, 775 A.2d at 448). Moreover, it

---

**10.** In *Lewis v. City of Indianapolis*, 554 N.E.2d 13, 17, n. 4 (1990), there was no liability on the part of the City. There, the claim was that the City emergency response was untimely, premised primarily on inability to reach the operator quickly. The court noted, however, that there was nothing to indicate that the victim had any special relationship with the City giving rise to a special, individualized duty on the defendant's part toward him and that the victim's stepdaughter "was not lulled into inaction by the 911 operator, whom she never reached. Moreover, when Vanessa's grandmother reached a 911 operator, assistance was immediately dispatched to the correct address."

**11.** While acknowledging that the Court of Special Appeals' use of "specific reliance" under the public duty test to mean "detrimental and justifiable reliance," consistent with the holdings of courts in other jurisdictions, *Fried*, 139 Md.App. at 265–66, 775 A.2d at 451, the majority did not adopt that definition, choosing instead, "to retain a more general special relationship test to preserve our case-by-case analytical approach to these issues" and to note "that those principles, along with others, may provide useful tools for assessing the reliance, actual or transferred, in a particular case." 370 Md. at 496, n. 31, 805 A.2d at 401, n. 31.

asserts that "there is no indication that [the 911 operator's] handling of Donte W's call exceeded or was markedly different than her handling of other similar calls and situations." *Id.* at 498–99, 805 A.2d at 403. The majority also rejects the argument that the answering and handling of 911 calls are acts for the protection or assistance of a specific group of individuals, i.e., foreseeable plaintiffs. It reasons:

> "By its terms, this statutory scheme does not create an emergency system to benefit a discrete group of persons. Rather, in providing for such broad services, it recognizes that, at different times, any and all citizens of, or visitors in, Maryland may find it necessary to utilize that system for innumerable purposes. In our view, acting to protect or assist a 'specific group of individuals,' sufficient to create a special relationship, involves more than general actions taken to serve members of the public at large in need of emergency telephone services. To find otherwise, by equating a duty to act with the provision of a general public service, might jeopardize the availability of those services in the first instance."

*Id.* at 498–500, 805 A.2d at 403–04.

Finally, the majority points out that the victim in *Fried* did not rely on the assistance sought from 911, either directly or actually, having neither been informed of the call or aware of it and, in any event, she was not entitled to the transfer of reliance of the third party in that case because that third party was a perpetrator of the act, thus presenting a scenario that society is unwilling to accept "as reasonable or justifiable." For these various propositions, it relies on *Wanzer v. District of Columbia,* 580 A.2d 127, 132 (D.C.App.1990) ("A one-time call to 911 for help is not enough to establish a special relationship. . . . To give rise to a special relationship, the agency's response to the private party must in some demonstrable way exceed the response generally made to other members of the public"); *Hines v. District of Columbia,* 580 A.2d 133, 136 (D.C.1990) ("[T]he mere fact that an individual has emerged from the general public and become an object

of the special attention of public employees does not create a relationship which imposes a special legal duty"); *Morgan v. District of Columbia* 468 A.2d 1306, 1313 (D.C.1983) (no special relationship "when the police gratuitously promise to provide protection.... Reassuring a citizen victimized by criminal conduct that help is on the way certainly does not mean that at all costs the action promised inexorably must follow ...."); and *Koher v. Dial,* 653 N.E.2d 524, 526 (Ind.Ct. App.1995) ("Standing alone, a governmental entity's dispatch of emergency services does not create a private duty.").

*Ashburn* contributes little of real substance to this discussion because it is easily distinguishable. Significantly, it does not involve the 911 emergency system. There, a police officer came upon a man, who was intoxicated and sitting behind the wheel of a pickup truck, whose engine was running and lights were on, on the parking lot of a 7–11 store. Rather than arrest the man for drunk driving, as he could have done, the officer elected instead to tell the man to pull his truck to the side of the lot and to discontinue driving that evening. When the officer left, the man drove the truck away from the lot, proceeded a short distance and collided with a pedestrian, who sued, claiming the officer's negligence. 306 Md. at 619–20, 510 A.2d at 1079. The analogy would be closer had the officer received a report of a drunk driver in the neighborhood and chosen to do nothing. Another interesting issue would have been presented had the drunk sued the officer.

Turning to the other cases on which the majority relies, *Morgan v. District of Columbia* 468 A.2d 1306 (D.C.1983), itself, acknowledges its inappositeness to the case sub judice: "it is important to state first what this case is *not* about. It is not about a situation where the police do not respond to an urgent call from a citizen who is in immediate danger of being harmed." *Id.* at 1310. Neither it, nor any of the others,[12] is persuasive, in any event.

---

**12.** *Koher v. Dial,* must be read in the context of legislative action, the passage of subsection (18) of Ind.Code § 34–4–16.5–3, granting a governmental entity immunity under the Tort Claims Act for the operation

The reasoning of the cases on which the majority relies, fails completely to take account of the legislative purpose in enacting legislation similar to the Maryland 911 legislation and, thereby, undermines and potentially renders the 911 system meaningless and useless. Indeed, to suggest that the operators of a 911 call system, mandated, financed, governed and directed by the State, has no duty to those who deign to use it, taking the government at its word that it will respond to their emergency timely and appropriately, simply does not make sense. As we have seen, the purpose for establishing the 911 emergency system and requiring the subdivisions to implement it was to create a centralized clearinghouse for such calls, the expectation being that that would enhance efficiency and expedition. Increased efficiency and expedition was not desired simply for their own sake, but for the sake of the lives and the property of Maryland citizens. The General Assembly recognized "the paramount importance of the safety and well-being of the citizens of Maryland" and "that when the lives or property of its citizens are in imminent danger, timely and appropriate assistance must be rendered," § 18–101(a), and expressed concern "that avoidable delays in reaching appropriate emergency aid are occurring to the jeopardy of life and property." *See* § 18–101(c).

An emergency system with the purpose of providing timely and appropriate response to calls reporting emergencies affecting the lives and property of citizens simply has no point if the purpose need not be fulfilled, if those charged with the responsibility of responding owe no duty to those who call or to those for whose benefit the system was established. I can see no reason to have a system with such high ideals as expressed in the legislation if there can be a failure to fulfill the purpose without consequence. The consequence of such a

---

of "an enhanced emergency communication [or '911'] system." *Benton v. City of Oakland City,* 721 N.E.2d 224 (Ind.1999). *See Barnes v. Antich,* 700 N.E.2d 262, 266 n. 6 (Ind.Ct.App.1998) ("a plain reading of Ind.Code 34–4–16.5–3(18) leads inescapably to the conclusion that the legislature intended to afford immunity from claims arising out of a municipality's operation and use of [a '911' service]").

scenario is a system with no rational basis and no incentive for those operating it to demand that it live up to, and achieve, its purpose.

In *Wanzer*, the District of Columbia Court of Appeals tells us that it takes more than one call to 911 for help to establish a special relationship and that a special relationship requires that the agency's response to the caller in "some demonstrable way exceed the response generally made to other members of the public." 580 A.2d at 132. It goes on to state: "Even a series of contacts over a period of time between a public agency and an injured or endangered person is not enough to establish a special relationship, absent some showing that the agency assumed a greater duty to that person than the duty owed to the public at large." *Id.* This does not make sense. The only reason anyone calls 911 is for help and, in Maryland, at least, that is prompted by the invitation the public is given to use an effective system, along with the promise of a timely and appropriate response. When the system actually is used, it is the existence of the system, the invitation to use it by holding out that there are benefits that flow from it, i.e., the promise of results, timely and appropriate response, from which a duty flows. That is the special relationship; there need be no other. The more pertinent observation to me, therefore, is that the 911 operator did not negate, avoid, the special relationship, by not answering, or better yet, telling the caller what would be the truth if the majority is correct, that he or she did not owe the caller a duty and, consequently, help may, or may not, be forthcoming.

Just as important, if the 911 system is to operate as intended, the response to each call will be generally the same—the caller will report the emergency, respond to whatever reasonable questions are required to allow for the dispatch of assistance and the operator will indicate what the response will be, indicate that help is coming. There neither should or ought to be a response that "demonstrably" exceeds another. After all, only those members of the public needing the emergency assistance will call, thereby triggering the need for a response. If the comparison is to the public at large, as

it seems to be, then the response to a 911 caller will always be, it is hoped, greater than that to the public at large, to whom the operator simply does not, and has no occasion to, relate.[13]

The statement in *Morgan* that reassuring a crime victim that help is on the way does not mean that it must, at all costs, arrive, is true. The difficulty I have is the context. The Court suggests, if not explicitly holds, that the 911 operator's negligence is an acceptable excuse for the help not arriving. When help does not arrive despite the non negligent action of the 911 operator, that is one thing. It is quite another when the sole reason for help not arriving *is* the negligence of the 911 operator. The latter is unacceptable, given the statutory scheme and the holding out of the 911 system as being beneficial and efficient in an emergency. I repeat, I believe a special relationship is created when a caller calls 911 to report an emergency, responding to such calls being, in addition to the expressed legislative purpose, the only purpose. It seems

---

**13.** In *Hines v. District of Columbia*, 580 A.2d 133, 138 (D.C.1990), the court opines:

"Appellant argues that the regulations, Mayor's order, and protocols applicable to the District's Emergency Ambulance Division create such a class of individuals—'persons who are seriously ill or injured and who receive emergency medical care and transportation by the Emergency Ambulance Division.' Appellant supports this argument by analogy to the source of the duty in *Turner[ v. District of Columbia,* 532 A.2d 662 (D.C.1987)], that is, the Child Abuse Prevention Act, D.C.Code § § 6–2101–2127 (1989 Repl.). We find the analogy unpersuasive. Virtually every citizen of the District could find himself or herself in need of assistance from the EAD at one time or another; if there is a particular 'class' of citizens who benefit, its members are distinguished from the general public only in that they are temporarily in need of emergency services. In this, they do not differ from citizens who find themselves in need of emergency police or fire services. *See Wanzer v. District of Columbia,* supra, 580 A.2d at 132–133. All of us may be temporary members of one or more of these 'classes' at some time. There exists no 'class' in the sense that would justify invoking the special relationship exception to the public duty doctrine."

If I understand the court, it is saying that if one is a potential member of a class, even one that is reasonably differentiated from other members of the public, there can be no special relationship. The majority engages in a similar discussion, using similar "logic." The logic, I confess, escapes me.

to me to follow that to avoid a duty to the caller the 911 operator must negate that special relationship by advising the caller that the system does not promise help or equivocate the promise of help.

*Hines* tells us that a member of the general public can become the object of special attention and yet still not be entitled to a special legal duty. If a member of the general public is not owed a duty and one who has emerged from the general public and become the object of special attention is not owed a duty, perhaps no one is owed a duty. That would be fine if the Legislature had exempted 911 operators from suits for simple negligence arising out of their employment, as it has done with regard to other emergency personnel. *See e.g.* Md Code (1974, 1998 Replacement Volume) §§ 5–603 of the Courts & Jud. Proc. Article (exempting those who offer emergency medical care at the scene of injury without a fee from liability unless the actions are grossly negligent); § 5–604 (exempting fire and rescue companies from liability unless willful or grossly negligent); § 5–605 (law enforcement officer acting outside jurisdiction).

To be sure, the victim in *Fried* neither knew nor was informed that someone was calling 911 on her behalf. It is likewise true that she did not have a familial or other close relationship with those who called 911 on her behalf, who were themselves the perpetrators of the acts resulting in the victim being in peril. The majority finds no duty for those reasons. I do not agree. Many victims in need of 911 service will not be able, either physically or because not near a phone to call 911. Those who are incapacitated will not be aware that help has been sought. Some will be discovered by strangers, who nevertheless will seek the help of 911 and a few, as in the present case, may have the perpetrator make the call. Why there would be a duty in one case and not in the others is not at all clear to me. When the victim is foreseeable, it seems to me to be of less consequence how the 911 system became aware of the emergency than what it does, or is required to do, to respond. So what if the victim does not know that help has been summoned or that it is summoned by someone he or

she does not know or even by someone who is culpable? Focusing on how the system is informed of the emergency misses the point—the emergency exists whoever reports it and whoever knows of the reporting and whoever perpetrates the offense giving rise to the emergency.

In my view, there is a duty owed by the 911 operator and the system to 911 callers and foreseeable plaintiffs when calls are placed to 911, consistent with the system's holding out of its merits and benefits, and the operators are informed of emergency situations requiring emergency assistance. Accordingly, I would reverse both of the judgments and remand for new trials.[14]

I dissent.

---

**14.** The majority does not address the special relationship test in *Muthukumarana*, concluding that the circumstances demonstrate that the 911 operator in that case. was not negligent. I do not agree. In my opinion, whether the 911 operator was negligent is a jury question. To be sure, the majority's conclusion is a permissible one for a trier of fact to draw after considering all of the evidence; however, I am far from satisfied that all of the inferences drawn from the 911 recorded call require that conclusion. In fact, I believe a jury could well decide on the basis of the recording itself, viewed in light of the circumstances and in the light most favorable to the plaintiff, that the 911 operator was negligent.